**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SYLVESTER D. WINCE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-01546 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CBRE, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

For 17 years, Plaintiff Sylvester Wince has shown up for work at Northwestern Hospital on Christmas Eve, Christmas Day, New Year's Eve, New Year's Day, and the Fourth of July. It wasn't by choice. Wince requested time off for each holiday – every year, for 17 years straight – without success. He claims that his employer, Defendant CBRE, Inc., forced him to work on the holidays, and did so because of his race.

That's not all. Wince claims that CBRE treated him unfairly for many years, in many ways. As Wince tells the story, CBRE rejected him for promotion sixteen times in favor of white candidates. CBRE also forced him to perform menial tasks while white co-workers with less seniority did the substantive work. And he wasn't paid what he was owed. To add insult to injury, his co-workers and supervisors subjected him to racial slurs.

Wince ultimately filed a seven-count complaint against CBRE and its managers. He advances several race discrimination claims, as well as claims under the Collective Bargaining Agreement and state and federal labor laws.

CBRE and the managers moved to dismiss three of the seven counts, primarily on preemption grounds. For the reasons explained below, Defendants' motion to dismiss the claims

under the Collective Bargaining Agreement (Count IV), the Fair Labor Standards Act (Count V), and the Illinois Wage Payment and Collections Act (Count VI) is granted. The Court denies the motion to dismiss Defendant Ernie Sanchez.

### Background

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint."[1] *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Plaintiff Sylvester Wince worked at Northwestern Hospital in downtown Chicago from 2001 to 2019.[2] *See* Corrected Second Am. Cplt., at ¶¶ 17, 158 (Dckt. No. 52). During those 18 years, he held two different positions, for two different companies. *Id.* at ¶¶ 17–18.

Wince began as a Maintenance Mechanic for Northwestern Hospital in 2001. *Id.* at ¶ 17. In 2007, Northwestern promoted him to Stationary Engineer. *Id.* By 2010, CBRE took over the facilities management operations for Northwestern Hospital. *Id.* Wince remained a Stationary Engineer, but CBRE was his new employer. *Id.*

---

[1] The Court understands from the hearings that Defendants have a much different view of the facts. But at this early stage, the Court must take the allegations of the complaint as true. The time for evidence comes later. No party should read anything in this opinion to suggest that the Court has a view of the underlying merits.

[2] Some of the complaint is in the present tense, suggesting that Sylvester continues to work for CBRE. *See, e.g.*, Corrected Second Am. Cplt., at ¶ 17 (Dckt. No. 52) (stating that Wince "has been employed by Northwestern Hospital since October 31, 2001"); *id.* at ¶ 18 (stating that Wince "works in the Feinberg Galter Building"); *id.* at ¶ 22 (stating that Wince "works in all three departments"). But Count VII alleges that Wince resigned in October 2019. *Id.* at ¶ 158. Plaintiff filed the case in March 2019, seven months before his resignation, so maybe the paragraphs with the present tense simply were not updated. The Court assumes that Wince no longer works for CBRE.

Until he resigned in 2019, Wince worked in the Feinberg Galter building at the hospital. *Id.* at ¶¶ 18, 158. He worked in the "plant operations division," which has three departments: controls, boiler operations, and systems. *Id.* at ¶ 22. Wince worked in all three departments. *Id.* He was one of the people working behind the scenes to keep the building up and running.

A few more details round out Wince's background. Wince is black, and he has lived in Chicago since at least 2001. *Id.* at ¶ 1. He graduated from Northwestern University in 2010 with a Bachelor of Science degree. *Id.* at ¶ 19. And he is a member of the International Union of Operating Engineers Local 399. *Id.* As a member of the Union, he is subject to a Collective Bargaining Agreement ("CBA"). *Id.*

The complaint alleges that Wince endured significant on-the-job mistreatment in the past few years. The mistreatment affected when he worked, what job he had, and how much he got paid.

The loss of overtime opportunities is a prominent example. The Collective Bargaining Agreement provides for overtime opportunities based on seniority. *Id.* at ¶ 23. Until he resigned, Wince was the most senior engineer in the controls department. *Id.* But CBRE denied him overtime more than 19 times since March 2018, and did so because of his race. *Id.* at ¶¶ 24–25. His co-workers (who aren't black) didn't suffer the same treatment. *Id.*

The complaint includes another example of the "targeted nature of this discriminatory behavior." *Id.* at ¶ 26. Wince had a conversation with Ernie Sanchez, the "Alliance Director of Facilities," about Wince's career advancement. *Id.* at ¶¶ 3, 26. Sanchez told Wince that he would not advance at CBRE unless he got a certificate in project management. *Id.* at ¶ 26. Wince listened and registered for the course. *Id.* But he never completed the course, and he blames his inability to pay on the lack of overtime opportunities. Sanchez created an

3

insurmountable hurdle: he "made it impossible for [Wince] to pay for this course by eliminating overtime opportunities." *Id.*

Wince claims he was cheated out of his full bonus because of his race, too. In 2018 and 2019, Northwestern Hospital provided CBRE funds to pay an annual bonus to each CBRE worker, amounting to 3.5% of their salary. *Id.* at ¶ 27. Instead of merely providing his employees with the 3.5% bonus, though, Sanchez conditioned the bonus on a performance evaluation. *Id.* at ¶ 28. Based on Wince's performance evaluation, Sanchez reduced Wince's bonus from $3,500 (presumably, 3.5% of Wince's salary) to $800 – even though Wince "had never been written up for his performance." *Id.* Wince alleges that the real reason was racial discrimination. *Id.* at ¶ 29.

CBRE prevented Wince from rising through the ranks, too. Wince was passed over for promotions that he deserved. *Id.* at ¶¶ 33–47. Management vacancies came and went, and CBRE never elevated Wince to more senior roles. Making matters worse, CBRE hired less-qualified individuals to fill them. The complaint offers a string of specific examples.

In 2015, CBRE filled a vacancy for the First Shift Assistant Chief Engineer position at the Lavin Family Pavilion. *Id.* at ¶ 33. The position paid $4 per hour more than Wince earned at the time. *Id.* at ¶ 42. But CBRE ultimately hired a white employee (Andrew Brudniak) instead of Wince. *Id.* at ¶ 33. Wince was senior to the other employee and had experience in several departments, including "boiler operations, systems, controls and chillers."[3] *Id.* at ¶ 35. The

---

[3] It is unclear if there were three departments, or four. Paragraph 22 lists three departments. *See* Corrected Second Am. Cplt., at ¶ 22 (Dckt. No. 52) ("The plant operations division in the Feinberg Galter Building consists of 3 departments: controls, boiler operations, and systems."); *id.* at ¶ 35 (referring to "three departments," but listing four departments). But paragraphs 34 and 35 suggest that there were four departments, or maybe more. *Id.* at ¶ 34 ("Prior to occupying the position of Assistant Chief[,] Andrew worked solely in refrigeration; he had never worked in boiler operations, systems, chillers, or controls."); *id.* at ¶ 35 ("SYLVESTER had worked in all three departments; this gave him experience in boiler operations, systems, controls and chillers.").

other employee had more limited experience, "solely in refrigeration." *Id.* at ¶ 34. Even though

the white employee had "no relevant experience," CBRE hired him anyway. *Id.* The

explanation from CBRE was upside down – CBRE told Wince that he had less experience, even

though he had more experience. *Id.*

In 2016, Brudniak stepped down, which meant that the position was vacant again. *Id.* at

¶¶ 36–37. Wince interviewed for the position. *Id.* at ¶ 38. By that point, interviewing for a

promotion was old hat. Wince had interviewed for promotions fifteen other times, but was

passed over each time. *Id.* He was 0-for-15.

The sixteenth attempt was no more successful. *Id.* Brudniak apparently returned and

regained his old position, and Wince lost out once again. *Id.* at ¶ 39. CBRE management told

Wince that he was "not what they were looking for" and that he "needed more experience and

leadership skills." *Id.* at ¶ 38. Again, Wince believes that the real reason was racial

discrimination. *Id.* at ¶ 39.

The same story played out the same way, for a different position. *Id.* at ¶ 43. In 2016,

CBRE hired someone named "Joe" as Chief of Plant Operations. *Id.* But Joe lacked Wince's

"credits, certificates, or commendations." *Id.* Wince was more senior than Joe, too. *Id.* at ¶ 44.

But Joe had one thing going for him: Joe was friends with "Sean," the CBRE individual

authorized to promote Joe to Chief of Plant Operations. *Id.* at ¶ 43. Joe was hired. Wince was

not. *Id.*

But Joe didn't last long in the role. When he left, Wince applied for the position. *Id.* at

¶ 44. Again, CBRE rejected him. *Id.* They never told him why. *Id.*

Wince points to yet another CBRE promotion opportunity that passed him by. *Id.* at ¶ 45. A role opened up for Chief Engineer of the Lavin Family Pavilion. *Id.* But CBRE hired a newcomer – who is not black – instead of Wince. *Id.*

Wince says that CBRE's advancement of these three individuals is part of a larger pattern, as illustrated by the composition of CBRE's management team. There are no black individuals on the CBRE management staff. *Id.* at ¶ 46.

CBRE hasn't allowed Wince to move up. And he hasn't enjoyed the holidays, either. For 17 years, Wince requested holiday time off for Christmas Eve, Christmas Day, New Year's Eve, New Year's Day, and the Fourth of July. *Id.* at ¶ 48. For 17 years, CBRE denied his requests. *Id.*

The Collective Bargaining Agreement requires CBRE to give holiday time off based on seniority. *Id.* at ¶ 49. But in reality, CBRE gave holiday time off to junior, non-black employees. *Id.* at ¶ 50. CBRE told Wince that he had "incorrectly filed [sic] out the paperwork request for time off." *Id.* at ¶ 51. As Wince sees it, that reason was pretextual. *Id.*

After Wince filed a union grievance in 2017, CBRE granted Wince time off for Christmas Day and New Year's Day. *Id.* at ¶ 52. But the days off came with a catch: they were conditioned on "sufficient staff coverage." *Id.* And in the end, Wince ended up working both Christmas and New Year's Day that year too. *Id.*

Racial discrimination permeated Wince's day-to-day work life. His tasks didn't match his seniority. He was required to respond to emergencies, *id.* at ¶ 64, plunge toilets, *id.* at ¶ 66, and perform menial tasks, *id.* at ¶ 69.

Wince alleges that CBRE "fostered an atmosphere of racial animus." *Id.* at ¶ 60. Everyone from his co-workers to his supervisors "felt free to direct racially hostile behavior

6

towards him." *Id.* Sometimes, the racial animus was out in the open. For example, Wince found racial slurs written on his tool chest. *Id.* at ¶ 61.

He told CBRE management about his mistreatment. He reported issues of harassment, intimidation, racial slurs, failure to promote, and failure to award overtime to CBRE's Human Resources department. *Id.* at ¶ 67. It didn't help. In fact, Wince's complaints made the situation worse. In response to the complaint, CBRE management retaliated against him, and assigned him work below his pay-grade. *Id.* at ¶ 68.

At some point, Wince had enough. Wince faced "persistent workplace harassment" and an "intolerable, hostile work environment." *Id.* at ¶¶ 156–57. The environment at work was "so extreme that he had not [sic] choice but to resign his position in October of 2019." *Id.* at ¶ 158.

Wince ultimately brought suit against CBRE, advancing seven claims. He brings race discrimination claims under Title VII (Count I) and under 42 U.S.C. § 1981 (Count II). He alleges that CBRE retaliated against him when he began complaining about racial discrimination (Count III). He also claims that CBRE breached the Collective Bargaining Agreement (Count IV), violated the Fair Labor Standards Act (Count V), violated the Illinois Wage Payment and Collection Act (Count VI), and constructively discharged him (Count VII).

In addition to CBRE, Wince also sued several managers: Ernie Sanchez, Richard Saulig, Sean Holland, Pedro Ravelo, Joe Hernandez, and Maya Nash.[4] *See* Corrected Second Am. Cplt., at ¶¶ 3–8 (Dckt. No. 52).

Defendants did not move to dismiss the race-based claims. But they did move to dismiss three of the seven claims, namely, the claims under the CBA (Count IV), the Fair Labor

---

[4] Wince sued a number of individual Defendants, but only Defendant Sanchez moved to dismiss. For purposes of this motion, the Court's factual background does not delve into Wince's allegations about the other individual Defendants.

Standards Act (Count V), and the Illinois Wage Payment and Collection Act (Count VI).[5]

Defendant Sanchez also moved to dismiss, claiming that he is the victim of mistaken identity.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Discussion

## I. The Collective Bargaining Agreement (Count IV)

CBRE begins by challenging the breach-of-contract claim based on the doctrine of complete preemption. Specifically, Defendant argues that Wince's breach-of-contract claim is preempted by section 301 of the Labor Management Relations Act ("LMRA"). In its view, the

---

[5] CBRE moved to dismiss Counts IV, V, and VI. The individual Defendants moved to dismiss only Count V (the FLSA claim), "to the extent it is asserted against them in their individual capacities." *See* Mtn. to Dismiss, at 1 (Dckt. No. 58). The complaint is ambiguous: Count V refers to "Defendant's" (singular) and "Defendants" (plural). *See* Corrected Second Am. Cplt., at ¶¶ 146, 145 (Dckt. No. 52). But Count IV (the CBA claim) and Count VI (the IWPCA claim) are against only CBRE. *See id.* at 21 (demanding judgment against "Defendant CBRE"); *id.* at 24 (demanding judgment against "Defendant CBRE").

claim should be dismissed or converted into a federal claim under section 301 of the LMRA. *See* Defs.' Mem. in Supp. of Mtn. to Dismiss, at 4 (Dckt. No. 59).

The LMRA grants federal courts jurisdiction to hear labor disputes, without regard to the amount in controversy or the citizenship of the parties. *See* 29 U.S.C. § 185. In addition, section 301 of the LMRA completely preempts state law claims that hinge on the interpretation of collective bargaining agreements. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987); *see also Nelson v. Stewart*, 422 F.3d 463, 467 (7th Cir. 2005) ("The Supreme Court has applied the complete preemption doctrine in cases that raise claims preempted by section 301 of the LMRA."). Preemption fosters "uniform, certain adjudication of disputes over the meaning of collective-bargaining agreements." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410– 11 (1988).

"If the resolution of a state law claim depends on the meaning of, or requires the interpretation of, a collective bargaining agreement, the application of state law is preempted and federal labor law principles must be employed to resolve the dispute." *Atchley v. Heritage Cable Vision Assocs.*, 101 F.3d 495, 499 (7th Cir. 1996) (citing *Lingle*, 486 U.S. at 405–06, 407, 409– 10, 413). A state law claim hinges on the interpretation of a collective bargaining agreement when it is "founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar*, 482 U.S. at 394 (quoting *Electrical Workers v. Hechler*, 481 U.S. 851, 859 n.3 (1987)).

The key question is whether the state law claim requires the Court to interpret the Collective Bargaining Agreement. If it does, the claim is preempted. *See Caterpillar*, 482 U.S. at 394. If it doesn't, and the claim merely references the CBA but doesn't require its interpretation, the state law claim can proceed. *See Lingle*, 486 U.S. at 407–13 (finding state law

retaliatory discharge claim was not preempted by § 301 because it did not require "construing the collective-bargaining agreement"). "Even if explicit terms of the collective bargaining agreement may not be on point," it can still be a matter of federal contract interpretation "whether the words of a collective bargaining agreement create implied rights." *Atchley*, 101 F.3d at 499.

The CBA is front and center in Wince's complaint. The background section of the complaint alleges that the CBA governs overtime and vacation pay. *See* Corrected Second Am. Cplt., at ¶¶ 23–24, 48–51 (Dckt. No. 52). The CBA is at the crux of Count IV, too. It begins by highlighting Wince's Union membership, and ends with a request to "enforce the CBA." *Id.* at ¶¶ 116, 129.

The complaint alleges that the CBA governed the significant job-related decisions: transfers, promotions, overtime, and time off. The CBA "specifies the protocol under which employees may request transfers within job classifications, seek promotions to new job classifications, and obtain overtime and holiday time off opportunities." *Id.* at ¶ 118. Wince alleges that CBRE violated those terms of the Collective Bargaining Agreement. *Id.* at ¶¶ 119–21. There's a good reason why Count IV is entitled "**VIOLATION OF THE COLLECTIVE BARGAINING AGREEMENT**." *Id.* at 19 (emphasis in original).

Wince's claim hinges on the meaning of the CBA. Still, Wince argues that there is no need to interpret any of its terms. *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 3 (Dckt. No. 70) ("Here, there is no need to interpret any term in the CBA . . . ."). Not so. The entire complaint rests on an understanding of what the CBA requires for transfers, overtime, promotions, and vacation pay. *See, e.g.,* Corrected Second Am. Cplt., at ¶¶ 23, 49, 118–24 (Dckt. No. 52). A claim about a violation of the CBA requires an understanding of the meaning of the CBA.

10

"[I]f it is necessary to interpret express or implied terms of a CBA, a state law claim is completely preempted by § 301 . . . ." *Atchley*, 101 F.3d at 499. If anything, Wince's breach-of-contract claim epitomizes the type of claim that the LMRA preempts. *See Greenslade v. Chicago Sun-Times, Inc*., 112 F.3d 853, 868 (7th Cir. 1997) (plaintiff's breach-of-contract claim was governed by CBA, and thus preempted); *Nat'l Metalcrafters, Div. of Keystone Consol. Indus. v. McNeil*, 784 F.2d 817, 823 (7th Cir. 1986) ("[A] determination that a contract is so clear as to make a breach willful . . . *is* an interpretation of the contract . . . .") (emphasis in original); *Schreiner v. U.S. Smokeless Tobacco Co*., 2018 WL 2967044, at *3 (N.D. Ill. 2018) (finding that the breach-of-contract claim was "clearly" preempted by the LMRA).

The LMRA preempts Wince's breach-of-contract claim, but that doesn't necessarily mean that it should be dismissed. Courts treat a preempted state law claim as a federal claim under section 301. *See Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) ("Because Plaintiffs' tortious interference claim requires interpretation of the CBA, § 301 preempts the claim and converts it into a § 301 claim.") (citations omitted); *Boogaard v. Nat'l Hockey League*, 126 F. Supp. 3d 1010, 1025 (N.D. Ill. 2015) ("Completely preempted claims are not automatically dismissed, but rather generally are treated as if they alleged breach of a collective bargaining agreement in violation of § 301.") (collecting cases). A preempted state law claim can have new life under federal law.

But the conversion to a federal claim requires an additional step. When a collective bargaining agreement includes a grievance procedure (as Wince's does), then a plaintiff must plead additional facts about the union's duty of fair representation. *See* Corrected Second Am. Cplt., at ¶¶ 122, 123, 126, 127, 128 (Dckt. No. 52).

11

To bring a section 301 claim for breach of a CBA, a plaintiff must allege that the union breached its duty of fair representation. *See Yeftich v. Navistar, Inc.*, 722 F.3d 911, 914 (7th Cir. 2013) (citing *Vaca v. Sipes*, 386 U.S. 171, 186–87 (1967)). That is, a plaintiff must allege not only a breach of the collective bargaining agreement by the employer, but also a breach of fair representation by the union. *See Marzillo v. United Auto Workers Local 551*, 227 F. Supp. 3d 975, 977–78 (N.D. Ill. 2016) ("Actions . . . in which an employee alleges a breach of the CBA in conjunction with a breach of the union's duty of fair representation ('DFR'), are known as 'hybrid' actions under § 301 of the Labor–Management Relations Act.") (citations omitted). In so-called hybrid claims, the breach-of-contract claim and the fair representation claim are "interlocked: neither claim is viable if the other fails." *Id.* (quoting *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1241 (7th Cir. 1997)); *Cortina v. Hotel and Rest. Emps. Union*, 2008 WL 857165, at *3 (N.D. Ill. 2008) ("The two components of a hybrid Section 301/fair representation claim are interdependent.").

The need to show a breach of duty stems from the grievance requirement. Ordinarily, an employee must pursue a breach-of-contract claim through the CBA's grievance procedure. During that process, the employee is represented by the union. An employee can bring a claim in federal court only if the complaint alleges that the union's representation was grossly inadequate – so inadequate that the employee, as a practical matter, had no opportunity to pursue the grievance process at all. *See Vaca*, 386 U.S. at 186–87; *Yeftich*, 722 F.3d at 914. Alleging that the union breached its duty of fair representation is key to demonstrating why a plaintiff has the right to be in court. If that procedure falls apart because the union failed to fairly represent its members, then – and only then – can a union member sue the employer for a breach of the collective bargaining agreement. *See Yeftich*, 722 F.3d at 914.

"When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty . . . to represent all members fairly." *Yeftich*, 722 F.3d at 915 (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998)). Like a fiduciary owes its "beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75 (1991) (citations omitted).

But unions enjoy "wide latitude" in that representation. *Yeftich*, 722 F.3d at 916. A union breaches its duty of fair representation only when its conduct is "arbitrary, discriminatory, or in bad faith." *Id.* (quoting *Vaca*, 386 U.S. at 190). Bad faith is a subjective inquiry (involving state of mind), and arbitrariness is an objective inquiry (involving unreasonableness to the point of irrationality). *Id.* at 916–17. "The union must provide some minimal investigation of employee grievances, but the thoroughness of this investigation depends on the particular case, and only an egregious disregard for union members' rights constitutes a breach of the union's duty." *Garcia v. Zenith Elecs. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (internal quotation marks and citations omitted).

CBRE argues that Wince hasn't surmounted this hurdle. As Defendant sees it, Wince presents "skeletal allegations" (and a thin skeleton, at that) that simply repeat the elements of a breach-of-duty claim. *See* Defs.' Mtn. to Dismiss, at 8 (Dckt. No. 59). The complaint includes no specificity about any breakdown in the grievance procedure. And, as a separate matter, CBRE argues that most of Wince's claims are time barred under the statute, anyway. *Id.* at 9–11.

The complaint's allegations about the Union's representation are threadbare. They span only four paragraphs. There isn't much content, either. Wince basically parrots the pleading

standard: the Union's "conduct in processing the various grievances filed by the Plaintiff was arbitrary, discriminatory and in bad faith, to the point that the Union breached its duty of good faith and fair representation." *See* Corrected Second Am. Cplt., at ¶ 128 (Dckt. No. 52).

The complaint does allege that Wince submitted grievances about holiday time off on seven specific dates. *Id.* at ¶ 126. And it alleges that he submitted grievances about overtime, promotions, and paid time off. *Id.* But the grievances apparently went nowhere, for reasons that are untold and unexplained. The complaint also alleges that he was "denied the opportunity to have his grievance timely addressed with the Union related to overtime until Plaintiff gave up and hired legal counsel." *Id.* at ¶ 122; *see also id.* at ¶ 123.

There isn't much else. Wince then announces a conclusion, alleging that he "exhausted the contractual grievance/arbitration procedures set forth in the CBA, prior to the filing of this lawsuit." *Id.* at ¶ 127.

Reciting the magic words is not enough. Courts have rejected similar attempts to sidestep the pleading standards in cases about a union's duty of fair representation. *See Yeftich*, 722 F.3d at 916–17 (finding that the complaint "lacks the factual specificity required to state a plausible breach-of-fair-representation claim"); *Rogers v. Jewel Food Stores*, 2014 WL 4913673, at *5 (N.D. Ill. 2014); *Cunningham v. United Airlines, Inc.*, 2014 WL 441610, at *10 (N.D. Ill. 2014), *aff'd sub nom. Cunningham v. Air Line Pilots Ass'n, Int'l*, 769 F.3d 539 (7th Cir. 2014) ("[M]ore is required of Plaintiffs given that they are seeking to plead a [duty of fair representation] claim against their union in the context of a collective bargaining agreement.").

The Seventh Circuit's decision in *Yeftich* is a good example. Yeftich, like Wince, argued that his union had acted arbitrarily and in bad faith. *Yeftich*, 722 F.3d at 916. But the allegations of the complaint were mostly conclusory. The "closest thing to a specific factual allegation" was

14

the statement that an "unnamed union official told the plaintiffs that their claims were being processed when this was not true." *Id.* at 915. The complaint alleged that the union "diverted, stalled, and otherwise terminated" the grievances, without adding facts about what actually happened. *Id.* at 916.

The Court of Appeals held that the complaint lacked the "necessary factual content" to state a plausible claim under section 301 of the Act. *Id.* at 914. Alleging that the union was guilty of bad faith (a subjective inquiry), without more, was not enough. *Id.* at 916. A complaint must offer "subsidiary facts," not merely "conclusory state-of-mind allegations." *Id.*

The Seventh Circuit found that the bare allegation of arbitrariness (an objective inquiry) was not good enough, either. *Id.* A plaintiff must do more than "generally allege an arbitrary failure to act on their grievances." *Id.* at 917. But the allegations of the complaint in *Yeftich* were fact-free.

The complaint in *Yeftich* did not "identify who filed the grievances, give dates or even a time frame across which grievances were filed, or otherwise describe the contents of the grievances." *Id.* at 917. The communications with the union were left unsaid, too: "They do not identify which union officials told which plaintiffs that their grievances were being processed, nor do they specify when these conversations occurred." *Id.* And "perhaps most importantly," the complaint did not reveal the normal wait time, and did not explain how long the plaintiffs waited before concluding that the union had abandoned the grievance. *Id.* "Without at least *some* background factual content, the complaint's allegations about 'abandoned' or 'dead' grievances are wholly conclusory." *Id.* (emphasis in original).

So too here. Wince comes forward with almost no facts about the grievance process. If anything, Wince offers even less than the plaintiffs in *Yeftich*. He alleges that his grievances

15

were not "timely addressed," but doesn't tell the backstory. *Id.* at ¶¶ 122–23. Raw conclusions unsupported by facts are "not enough to take the plaintiffs' complaint over the line from a 'possible' to a plausible claim of entitlement to relief." *Yeftich*, 722 F.3d at 917; *see also Rogers*, 2014 WL 4913673, at *5 (dismissing plaintiff's hybrid Section 301/fair representation claim because he "failed to sufficiently allege either bad faith or arbitrariness by the union"); *Cunningham*, 2014 WL 441610, at *10.

Simply put, Wince has not alleged facts supporting the bare conclusion that the Union violated its duty of fair representation. And without facts showing that the Union breached its duty of fair representation, there is no claim that CBRE breached the Collective Bargaining Agreement. Count IV is dismissed.

## II. The Fair Labor Standards Act (Count V)

Defendants also move to dismiss Wince's claim under the Fair Labor Standards Act ("FLSA"). They argue that the FLSA does not create a cause of action for loss of accrued paid time off. *See* Defs.' Mtn. to Dismiss, at 11–12 (Dckt. No. 59).

Wince's claim under the FLSA rests entirely on the notion that CBRE failed to pay him his paid time off. *See* Corrected Second Am. Cplt., at ¶¶ 133–46 (Dckt. No. 52). That much is clear from an opening paragraph of Count V: "This Count arises from the Defendants [sic] violation of the FLSA for its failure to keep proper records related to Plaintiff's Paid Time Off ('PTO') due to him as a full-time employee with over 18 years of service." *Id.* at ¶ 132. He complains about paid time off that is "missing" and "unaccounted" for. *Id.* at ¶¶ 138, 139.

Under the FLSA, employers must pay their employees a minimum hourly rate up to forty hours a week, and one-and-one-half times that hourly rate for overtime (that is, time worked in excess of forty hours a week). *See DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 735 F.3d 568, 570

(7th Cir. 2013) ("The FLSA's two core provisions – the minimum wage provision and the overtime provision – require that employees receive a minimum wage for each hour that they are 'employed' as well as a premium wage (one and one-half times the regular rate of pay) for each hour they are 'employed' beyond forty hours in one work week.") (cleaned up) (quoting 29 U.S.C. §§ 206(a), 207(a)); *Labriola v. Clinton Entm't Mgmt., LLC*, 2016 WL 1106862, at *4 (N.D. Ill. 2016) ("The FLSA is 'designed to protect workers from the twin evils of excessive work hours and substandard wages.'") (quoting *Howard v. City of Springfield*, 274 F.3d 1141, 1148 (7th Cir. 2001)); *Renteria v. Italia Foods, Inc*., 2003 WL 21995190, at *1 (N.D. Ill. 2003) (holding that the FLSA "obligate[s] an employer to compensate its employees at one and one-half times the regular rate for all hours worked over forty per week"). That is, the statute requires a minimum payment for time – and overtime – worked by employees who qualify under the FLSA.

But the FLSA does not require payment for time *not* worked. The FLSA "requires employers to compensate employees at certain rates for their work, but does not require them to pay employees for vacation time." *Yancy v. Vill. of Maywood*, 2012 WL 1623230, at *4 (N.D. Ill. 2012) (citing 29 C.F.R. §§ 778.271(b)(2), 218(a)). Indeed, "failure to pay vacation hours is not a violation of the FLSA because payments for vacation times 'are not regarded as compensation for working.'" *Morke v. Archer Daniels Midland Co*., 2010 WL 2403776, at *2 (W.D. Wis. 2010) (quoting 29 C.F.R. § 778.219).

There are a number of textual clues that support that outcome. The remedy provision shows that the FLSA covers compensation for working, not compensation for not working. Section 216 authorizes a claim by an employee against an employer who violates section 206 (minimum wage) and section 207 (overtime), both of which involve time spent working. *See* 29

U.S.C. § 216(b). The remedy provision entitles an employee to recover "unpaid minimum wages" and "unpaid overtime compensation" – meaning time worked – but says nothing about any recovery for vacation time. *Id.*

The overtime provision offers another textual clue that the Act does not require payment for vacation time. It requires compensation to an employee "at a rate not less than one and one-half times the regular rate at which he is employed." *See* 29 U.S.C. § 207(a)(1). The term "regular rate" includes "all remuneration for employment" paid to an employee, but expressly excludes vacation time. *Id.* at § 207(e). "As used in this section the 'regular rate' at which an employee is employed . . . shall not be deemed to include . . . payments made for occasional periods when no work is performed due to vacation . . . ." *Id.* at § 207(e)(2). Vacation pay is not part of the calculation of overtime.

Nothing in the text of the statute entitles Wince to vacation pay, so he has no claim under the FLSA. *See Yancy*, 2012 WL 1623230, at *4; *Thomas v. Good Vision Taste Inc.*, 2018 WL 4268909, at *1 n.2 (E.D.N.Y. 2018) (citing cases); *Arjumand v. Laguardia Assocs., LP*, 2015 WL 1470470, at *5 (E.D.N.Y. 2015) ("Under FLSA, '[e]mployees do not have a statutory entitlement to accrued vacation pay.'") (brackets in original; citation omitted); *Jeffers v. NetJets Servs., Inc.*, 2018 WL 1115364, at *3 (S.D. Ohio 2018) ("[T]he FLSA does not require payment for absence of work for vacation, holiday, illness or any other reasons.") (citation omitted); *Okonkwo v. Callins Law Firm, LLC*, 2015 WL 12880529, at *4 n.2 (N.D. Ga. 2015) ("[T]he FLSA does not require . . . vacation pay . . . .") (brackets in original; citation omitted); *Morke*, 2010 WL 2403776, at *2; *Field v. Am. Mortg. Express, Corp.*, 2009 WL 3562423, at *4 (N.D. Cal. 2009) ("[T]he FLSA does not provide a cause of action for individuals . . . who claim they were denied wages, benefits, or vacation pay due to them at termination.").

18

Wince's claim for vacation pay under the FLSA (Count V) is dismissed.

## III.   The Illinois Wage Payment and Collection Act (Count VI)[6]

Count VI is a claim under the Illinois Wage Payment and Collection Act ("IWPCA"). Wince basically alleges that the Illinois statute required CBRE to pay him his paid time off.

The IWPCA requires the timely payment of earned wages: "All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned." *See* 820 ILCS 115/4. The statute defines "wages" as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the two parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." *See* 820 ILCS 115/2. A successful plaintiff can recover unpaid wages, plus monthly statutory penalties. *See* 820 ILCS 115/14; *see also Miller v. Illinois Bell Tel. Co.*, 157 F. Supp. 3d 749, 757 (N.D. Ill. 2016).

Wince alleges that, after 15 years of service, he was "guaranteed a minimum of 240 hours of PTO [paid time off] plus 9.23 hours of additional PTO for every two weeks' pay period." *See* Corrected Second Am. Cplt., at ¶ 133 (Dckt. No. 52). He believes that he is entitled to "9.23 hours of earned PTO" during each pay period. *Id.* at ¶ 149. But CBRE neglected to pay him "over 200 hours in PTO," apparently because of faulty "timekeeping." *Id.* at ¶ 150. Wince claims that the failure to pay him the paid time off violated the Illinois statute.

---

[6] Wince's Second Amended Complaint contains a typographical error: there are two counts labeled "Count VI." *See* Corrected Second Am. Cplt., at 23–24 (Dckt. No. 52). On page 23, the claim under the Illinois Wage Payment and Collection Act is labeled "Count VI." But so is the constructive discharge claim on page 24. The constructive discharge claim is Count VII, not Count VI.

CBRE argues that the claim is preempted by the Labor Management Relations Act (again, the "LMRA"), just like his state law breach-of-contract claim. *See* Defs.' Mtn. to Dismiss, at 13–15 (Dckt. No. 59). Defendant is correct.

Again, section 301 of the LMRA preempts state laws that "do not exist independently of private agreements" and that "purport to define the meaning of the contract relationship." *See Healy v. Metro. Pier and Exposition Auth.*, 804 F.3d 836, 841 (7th Cir. 2015) (cleaned up) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985)). So, it preempts claims "'founded directly' on the collective bargaining agreement," as well as "state law claims that indirectly implicate a collective bargaining agreement." *Id.* (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 394 (1987)). Preemption under section 301 "covers not only obvious disputes over labor contracts, but also any claim masquerading as a state-law claim that nevertheless is deemed 'really' to be a claim under a labor contract. These cases are understood to arise under federal law (Section 301 of the LMRA) from their inception." *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 797 (7th Cir. 2013). If the resolution of the claim is "sufficiently dependent on an interpretation of the CBA," then section 301 preempts the state law claim. *Baker v. Kingsley*, 387 F.3d 649, 657 (7th Cir. 2004).

Courts in this district regularly conclude that section 301 of the LMRA preempts state law claims under the IWPCA when the claims require an interpretation of a labor contract. *See, e.g., Miller*, 157 F. Supp. 3d at 757–58; *Escudero v. Acres Group*, 2019 WL 5963611, at *3 (N.D. Ill. 2019) ("Because Defendants' argument is 'arguable or plausible' the Court must interpret the CBA, and therefore Escudero's IWPCA claim is preempted by Section 301 of the LMRA."); *Balmes v. Illinois Bell Tel. Co.*, 2016 WL 1019764, at *9 (N.D. Ill. 2016) ("[I]f Balmes continues to try to root his IWPCA claims in the collective bargaining agreements, the

claims will be preempted."); *House v. Illinois Bell Tel. Co.*, 148 F. Supp. 3d 701, 707 (N.D. Ill. 2015) ("IWPCA claims that depend on the construction and application of collective bargaining agreements are preempted.").

This case fits the mold. Wince's claim rests on the meaning of the CBA. He claims that his "wages earned during each and any given period should include 9.23 hours of earned PTO." *See* Corrected Second Am. Cplt., at ¶ 149 (Dckt. No. 52). Wince says that on his "fifteenth year of service he was guaranteed a minimum of 240 hours of PTO plus 9.23 hours of additional PTO for every two weeks' pay period." *Id.* at ¶ 133.

Wince doesn't expressly allege that the CBA – as opposed to something else – guaranteed him the 9.23 hours of additional paid time off. But what else could it be? The CBA governs his employment relationship, and the CBA expressly includes a section titled "PAID TIME OFF."[7] *See* CBA effective 9/1/18 through 8/31/21, Defs.' Ex. A (Dckt. No. 59-1, at 8 of 13) (underline in original); CBA effective 9/1/15 through 8/31/18, Defs.' Ex. B (Dckt. No. 59-2, at 7 of 14). The CBA awards paid time off based on the years of service, as shown in an accompanying table. *See* CBA effective 9/1/18 through 8/31/21, Defs.' Ex. A (Dckt. No. 59-1, at 8 of 13); CBA effective 9/1/15 through 8/31/18, Defs.' Ex. B (Dckt. No. 59-2, at 8 of 14). The CBA also requires employees to resolve any dispute about paid time off through the grievance process. *See* CBA effective 9/1/18 through 8/31/21, Defs.' Ex. A (Dckt. No. 59-1, at 9 of 13). Wince alleges that he submitted a grievance about his paid time off. *See* Corrected Second Am. Cplt., at ¶ 126 (Dckt. No. 52).

---

[7] Wince alleges that his problems with paid time off began "[s]ometime in 2018." *See* Corrected Second Am. Cplt. ¶¶ 134–35 (Dckt. No. 52) ("Sometime in 2018, CBRE did intentionally and wrongfully retire the Plaintiff, after which his time calculations were erroneous."). So, the relevant CBAs include the CBA effective from 9/1/15 through 8/31/18 and the CBA effective from 9/1/18 through 8/31/21.

Wince doesn't explain where, exactly, the entitlement to "9.23 hours" comes from. Looking at the CBA, that amount does not jump off the page. But Defendants suggest that it comes from the CBA. *See* Defs.' Mtn. to Dismiss, at 13 (Dckt. No. 59) ("Plaintiff's WPCA cause of action should be dismissed because his purported entitlement to vacation benefits is governed by the CBA."). In his response brief, Wince does not deny that he is relying on the CBA for his claim. In fact, the section of his brief about the IWPCA states that Defendants "breached the CBA." *See* Pl.'s Resp. to Mtn. to Dismiss, at 7 (Dckt. No. 70).

Instead, Wince argues once again that his claim doesn't require "<u>interpretation</u>." *Id.* (underline in original). Not so. The question is whether Wince was entitled to paid time off, and if so, how much. That question necessarily turns on an interpretation of the CBA. There is no way around it.

The motion to dismiss Count VI is granted.

## IV. Wince's Failure to Name and Serve Defendant Sanchez

Finally, Defendant Ernie Sanchez moves to dismiss on the grounds that he is an "incorrect party" and was "mistakenly sued." *See* Defs.' Mtn. to Dismiss, at 1, 15 (Dckt. No. 59). He invokes three different provisions of Rule 12, covering dismissal for lack of personal jurisdiction, insufficient service of process, and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(2), (5), (6). He basically argues that it's a case of "mistaken identity," and that Plaintiff sued the wrong Ernie. The right Ernie is Ernest Pierz, not Ernie Sanchez. *See* Defs.' Mtn. to Dismiss, at 3.

The argument quickly goes off the rails. Sanchez doesn't really argue that this Court lacks personal jurisdiction over him. Sanchez admits that was "one of Plaintiff's co-workers,"

22

which means that he worked in Chicago. *See* Defs.' Mtn. to Dismiss, at 3, 15 (Dckt. No. 59). He invokes none of the standards for personal jurisdiction.

Sanchez doesn't really challenge service of process, either. He doesn't argue that he failed to receive a summons, or that service of process was defective for some other reason. In the Initial Status Report for Reassigned Case, the parties stated that "Defendant Pedro Regdov" had not been served, but said nothing about Sanchez. *See* Initial Status Report, at 2 (Dckt. No. 38). Sanchez doesn't deny that he's Sanchez, and doesn't deny that he received a summons and the complaint.[8]

Instead, Sanchez basically argues that the complaint has got the wrong guy. Sanchez denies that he worked in management as "the current Alliance Director of Facilities at CBRE," as the complaint alleges. *See* Corrected Second Am. Cplt., at ¶ 3 (Dckt. No. 52). Instead, Sanchez claims that he is "one of Plaintiff's co-workers, is a Union member, and has never held a management position at CBRE." *See* Defs.' Mtn. to Dismiss, at 15 (Dckt. No. 59).

That may be true, but it has nothing to do with personal jurisdiction, service of process, or failure to state a claim. Sanchez basically argues that he doesn't belong in this case because he didn't do it. That's an argument about the merits, so it's an argument for a later day.

The Court denies the motion to dismiss Defendant Sanchez.

---

[8] That said, Plaintiff neglected to file a proof of service, or a waiver of service, as required by Rule 4. "[P]roof of service must be made to the court," so that the Court can confirm that all parties are present and accounted for. *See* Fed. R. Civ. P. 4(l)(1) (requiring proof of service); Fed. R. Civ. P. 4(d)(4) (allowing the filing of a waiver of service of process in lieu of proof of service). But the "[f]ailure to prove service does not affect the validity of service." *See* Fed. R. Civ. P. 4(l)(3). As previously ordered, Plaintiff must file proof of service, or a waiver of service of process, for each Defendant by October 30, 2020. *See* Order dated 10/19/20 (Dckt. No. 82).

## Conclusion

For the reasons stated above, the Court grants Defendants' motion to dismiss Counts IV, V, and VI. *See* Dckt. No. 58. The Court denies the motion to dismiss Defendant Sanchez. *Id.*


Date:   October 26, 2020

                                           _____

Steven C. Seeger
United States District Judge