**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **SYLVESTER D. WINCE,** ) | |
| ) | **No. 1:19-cv-01546** |
| **Plaintiff,** ) | |
| ) | **Judge Steven C. Seeger** |
| **vs.** ) | **Magistrate Judge Jeffrey T. Gilbert** |
| ) | |
| **CBRE, INC., et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendants CBRE, Inc., Jo[s]e Hernandez, Sean Holland, Maya Nash, Ernie Pierz, Pedro Ravelo, and Richard Saulig (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(a), submit the following Statement of Material Facts as to Which There is No Genuine Issue:

**I. Jurisdiction, Venue and Parties.**

1.     Plaintiff Sylvester Wince ("Plaintiff" or "Wince") is a resident of Chicago, Illinois. (Dkt. No. 96/Third Amended Complaint ("Third Am. Compl.") at ¶ 1; Ex. 1/Wince Dep. 16:6-8.)[1]

2.     Defendant CBRE, Inc. ("Defendant" or "CBRE") is incorporated in Delaware and maintains its principal place of business in Los Angeles, California. (Dkt. No. 96/Third Am. Compl. ¶ 2.)

3.     Defendants Ernie Pierz (White), Pedro Ravelo (White), Maya Nash (Black), Richard Saulig (White), Sean Holland (White), and Jose Hernandez (Hispanic) are residents of

---

[1] The Exhibits referenced herein are contained in the Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment, being filed herewith.

the State of Illinois. (Dkt. No. 96/Third Am. Compl. ¶¶ 3-8; Ex. 49/Declaration of Maya Nash ("Nash Decl.") ¶ 9.)

4.　　On November 5, 2018, Wince filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Illinois Department of Human Rights ("IDHR") alleging he was (1) subjected to harassment and disparate treatment based on his race (Black); and (2) retaliated against for complaining of alleged race discrimination and acting as a witness for another employee who filed a Charge of Discrimination against CBRE, which the EEOC dismissed on November 30, 2018 by issuing a Notice of Right to Sue. (Dkt No. 96/Third Am. Compl. ¶¶ 78, 79, Exs. A and B.)

5.　　After filing an initial Complaint on March 4, 2019 and several amended complaints thereafter, Wince filed a November 28, 2020 Third Amended Complaint against Defendants that asserted the following claims: (1) race discrimination and retaliation against CBRE in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (Counts I and III); (2) race discrimination and retaliation in violation of 42 U.S.C. § 1981 against all Defendants (Count II); and (3) constructive discharge against CBRE (Count IV). (Dkt. Nos. 1, 20, 52, 96/Third Am. Compl.)

6.　　This Court has jurisdiction over Wince's Title VII and Section 1981 claims pursuant to 28 U.S.C. § 1343, and to the extent Wince is asserting a separate claim for constructive discharge, supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a); venue is proper under 28 U.S.C. § 1391(b). (Dkt. No. 96/Third Am. Compl. ¶¶ 12-13.)

## II. Factual Background.

### A. Background on Wince's Employment.

7.　　Wince was hired by CBRE in October 2010 as a Stationary Engineer when the facilities department at Northwestern Memorial Hospital ("NMH"), where Wince had been

employed since 2001, was contracted out to CBRE. (Ex. 1/Wince Dep. 11:24-12:2, 47:17-21, 48:24-49:4, 55:12-57:3; Ex. 4/Wince Dep. Ex. 3.)

8. Generally, a CBRE Stationary Engineer "operates, maintains and performs preventative maintenance along with urgent corrective and routine repairs on all mechanical, plumbing, pneumatic and HVAC equipment throughout the campus and as outlined in the current CBA [collective bargaining agreement]"; must "[r]espond[] immediately to all Emergency Operations pages or calls"; and "[m]ay perform less technical duties as required, such as minor plumbing, lighting repairs, [and] door repairs…" (Ex. 1/Wince Dep. 53:20-55:8; Ex. 3/Wince Dep. Ex. 2 at CBRE-WINCE 000638-639.)

9. Wince worked in the Controls area beginning in the 2015/2016 timeframe until he officially moved out of Controls on November 23, 2016, although at times he was still called to work there as needed. (Ex. 1/Wince Dep. 98:9-99:13, 134:1-135:13; Ex. 15/Wince Dep. Ex. 15.)

10. Wince received a Bachelor's degree in organizational behavior from Northwestern University in 2010 and, as relevant to his job as a Stationary Engineer, holds certifications in Basic Electricity 1, Refrigeration 1 and 2, and Indoor Air Quality 1 and 2, and is a licensed stationary engineer in the City of Chicago. (Ex. 1/Wince Dep. 17:8-13, 18:10-17, 25:1-27:5, 28:17-21.)

11. Wince received a rating of 2 out of 4 (4 being the highest) on his 2011 Annual Performance Review from Manager Mike Carroll and in September 2012, Carroll placed him on a Performance Improvement Plan ("PIP") for unsatisfactory performance. (Ex. 1/Wince Dep. 126:15-129:11; Exs. 9, 10/Wince Dep. Exs. 9, 10.)

12. Wince received ratings of 3 ("Achieved") from Managers Carroll in his 2012 and 2013 Annual Performance Evaluations; Robert Kurban in his 2014 Annual Performance Evaluation; and Ralph Piotrowski in his 2015 and 2016 Annual Performance Evaluations. (Ex.

1/Wince Dep. 129:23-130:10, 130:17-23, 131:10-21, 132:1-6, 132:14-133:3, 135:21-136:1, 136:22-24; Exs. 11, 12, 13, 14, 16/Wince Dep. Exs. 11, 12, 13, 14, 16.)

13.     Other than the PIP, the only discipline Wince received was a verbal warning (without any loss in pay) on March 5, 2019 from Chief Engineer Jose ("Joe") Hernandez (Hispanic) and Assistant Operations Manager Alejandro Corona (Hispanic) for failing to respond to a work order regarding a water leak in a kitchen; Wince disagreed with the warning and believed Hernandez and Corona wanted to put this on his work record because he was a "minority." (Ex. 1/Wince Dep. 139:4-7, 140:9-142:8, 168:11-169:13, 170:14-171:2, 181:22-182:1, 182:12-17; Ex. 17/Wince Dep. Ex. 17.)

14.     Wince believes that he was treated differently than his White counterparts with respect to the March 5, 2019 verbal warning and cited (1) an engineer who in 2016 lost a chiller plant that he was able to get back online and Wince does not know what caused the loss, how long it took this individual to respond or if he was disciplined; (2) an engineer who lost a boiler plant in 2014 and Wince does not know why it failed, why it took this individual between 45 minutes and an hour to respond, or if he was disciplined; and (3) Mike (whose last name Wince could not recall) who lost a cooling tower in 2018 and Wince does not know how long it took Mike to respond or whether he was disciplined. (Ex. 1/Wince Dep. 171:8-177:11, 179:7-14.)

15.     When asked how he got along with Carroll, Kurban, Piotrowski, Corona and Hernandez, Wince answered that he was an employee and they were his managers and he did what they asked him to do. (Ex. 1/Wince Dep. 129:12-15; 131:16-24, 132:21-24, 138:17-22, 170:6-10.)

### B. CBRE Policies and Complaint Procedures.

16.    Wince understood that CBRE had Equal Employment Opportunity and Discrimination and Harassment policies that prohibited retaliation and provided several means to report violations—including through an Ethics Helpline—and that stated, inter alia:

> CBRE has a long-standing commitment to providing equal employment opportunity (EEO). This includes all aspects of the employment relationship including … promotion, demotion, transfer, work assignments, compensation, benefits, training, layoffs, [and] … terminations…

> CBRE complies with all applicable EEO laws and regulations. We have also established policies and practices that support the company's position on prohibiting discrimination or harassment on the basis of race …

> CBRE is committed to providing a workplace free of harassment … and discrimination based on race …

> Neither discrimination nor harassment will be tolerated, and both are prohibited by employees and non-employees working with us. CBRE considers such behavior unacceptable, contrary to our company values and undermining to our goal of providing an inclusive work environment.

(Ex. 1/Wince Dep. 60:15-62:18, 70:2-15, 71:4-19; Ex. 5/Wince Dep. Ex. 5 at CBRE-WINCE 000291, 294-95, 308-09; *see also* Ex. 1/Wince Dep. 43:15-44:3, 52:4-24; Ex. 2/Wince Dep. Ex. 1 at CBRE-WINCE 000245.)

17.    The only time Wince contacted Human Resources was when he was mistakenly identified as a retired employee and taken out of the system when another employee with the same first name retired; he does not know who did this, whether it was accidental or whether it happened to anyone else, and the error was fixed without Wince suffering any financial loss. (Ex. 1/Wince Dep. 68:10-70:1, 292:13-293:18.)

18.    Wince "not too long ago" contacted the Ethics Helpline to follow up on a complaint he made in 2017 regarding his failure to be promoted "based on the fact that [he's] black"; Wince does not know if anyone investigated his complaint or if his managers were aware of it. (Ex. 1/Wince Dep. 62:19-64:5, 67:23-68:5, 70:16-71:3.)

19.     In 2013 or 2014, Wince spoke to an outside investigator/attorney who asked how African Americans were being treated and Wince shared his concern about not being promoted; Wince did not speak to him or any outside investigator or third party (other than Wince's own lawyer) about this CBRE employee or how he allegedly was treated. (Ex. 1/Wince Dep. 36:3-39:13.)

20.     Wince complained to management about PTO, vacation, and promotions but never complained that any decisions were racially motivated. (Ex. 1/Wince Dep. 388:8-18.)

### C. Collective Bargaining Agreements.

21.     Wince's employment was governed by collective bargaining agreements between CBRE and the International Union of Operating Engineers of Chicago, Illinois and Vicinity Local 399, with which Wince generally was familiar, that were in effect from (1) September 1, 2010 through August 31, 2015 ("2010 CBA"), (2) September 1, 2015 through August 31, 2018 ("2015 CBA"), and (3) September 1, 2018 through August 31, 2021 ("2018 CBA") (collectively, "CBAs"). (Ex. 1/Wince Dep. 71:20-72:24, 94:12-95:3, 118:8-24; Exs. 6, 7, 8/Wince Dep. Exs. 6, 7, 8; Ex. 49/Nash Decl. ¶¶ 4-5.)

22.     The CBAs provided that "[t]he right to employ, discipline, discharge and lay off for cause shall be vested solely in the Employer, but the Union shall have the right in case of discharge, discipline, or layoff to investigate the reasons therefore and to protect such discharge, discipline or layoff through the grievance procedure." (Ex. 1/Wince Dep. 73:12-74:4, 95:12-15, 119:17-20; Ex. 6/Wince Dep. Ex. 6, Section 5 at CBRE-WINCE 000094; Ex. 7/Wince Dep. Ex. 7, Section 5 at CBRE-WINCE 000128; Ex. 8/Wince Dep. Ex. 8, Section 5 at CBRE-WINCE 000165; Ex. 49/Nash Decl. ¶¶ 4-5.)

23.     The CBAs contained grievance and arbitration provisions that provided how disputes were to be resolved and stated that if an employee had a grievance, "it shall be presented

to [the immediate supervisor outside of the bargaining unit (2010 and 2015 CBAs) or to the Lead Engineer (2018 CBA)] within [five (5) working days (2010 and 2015 CBAs) or two (2) working days (2018 CBA)] after the event that gave rise to the grievance." (Ex. 1/Wince Dep. 88:4-89:2; 90:4-7, 113:9-114:8, 122:22-123:5; Ex. 6/Wince Dep. Ex. 6, Section 29 at CBRE-WINCE 000109-110; Ex. 7/Wince Dep. Ex. 7, Section 31 at CBRE-WINCE 000144-146; Ex. 8/Wince Dep. Ex. 8, Section 31 at CBRE-WINCE 000181-183; Ex. 49/Nash Decl. ¶¶ 4-5.)

24. Wince understood that the 2010 collective bargaining agreement provided that "[s]eniority is the length of service in the bargaining unit at NMH. Seniority within a classification shall apply for choice of vacation, layoff, call back, vacancies on jobs and shifts. Seniority shall also apply in promotions provided that the employee has the ability to perform the job." (Ex. 1/Wince Dep. 76:13-79:14; Ex. 6/Wince Dep. Ex. 6, Section 11 at CBRE-WINCE 000099.)

25. Wince understood that the 2015 and 2018 collective bargaining agreements provided that "[s]eniority is the length of service in the bargaining unit at NMH. Bargaining unit seniority within a work group and classification shall apply for choice of vacation, layoff and call back. For a period of six (6) months after completion of the re-bid process, bargaining unit seniority within a work group and classification shall also apply in promotions and vacancies on jobs and shifts provided that the employee has the ability to perform the job." (Ex. 1/Wince Dep. 96:8-18, 120:7-14; Ex. 7/Wince Dep. Ex. 7, Section 11 at CBRE-WINCE 000133; Ex. 8/Wince Dep. Ex. 8, Section 11 at CBRE-WINCE 000170; Ex. 49/Nash Decl. ¶¶ 4-5.)

26. The bargaining unit consisted of three work groups, the first of which was the Hospital work group that provided services to Feinberg Pavilion, Galter Pavilion, Olson Pavilion and Prentice Women's Hospital and in which Wince worked "for the most part" during his employment and from 2015 or 2016 going forward. (Ex. 1/Wince Dep. 96:19-97:10, 97:20-98:1;

Ex. 7/Wince Dep. Ex. 7, Section 12 at CBRE-WINCE 000134; *see also* Ex. 8/Wince Dep. Ex. 8, Section 12 at CBRE-WINCE 000171; Ex. 49/Nash Decl. ¶¶ 4-5.)

27.     The CBAs contained an overtime section that generally provided that work in excess of forty (40) hours in any one (1) workweek was to be paid at one and one-half (1½ ) times the employee's regular hourly rate. (Ex. 1/Wince Dep. 80:9-22, 111:11-13, 121:8-14; Ex. 6/Wince Dep. Ex. 6, Section 16, at CBRE-WINCE 000101; Ex. 7/Wince Dep. Ex. 7, Section 15, at CBRE-WINCE 000137-138; Ex. 8/Wince Dep. Ex. 8, Section 17 at CBRE-WINCE 000174-175; Ex. 49/Nash Decl. ¶¶ 4-5.)

28.     The CBAs contained a paid time off ("PTO") section that provided that paid time off was to be granted based on continuous years of service, scheduling was "subject to the approval of the Employer", and "[i]nsofar as practical, PTO time will be granted to meet the request of employees and, if requested in advance according to departmental procedures, employees with the greatest seniority shall have first choice of time off." (Ex. 1/Wince Dep. 81:1-3, 82:8-23, 112:4-10, 121:15-122:7; Ex. 6/Wince Dep. Ex. 6, Section 19 at CBRE-WINCE 000102-103; Ex. 7/Wince Dep. Ex. 7, Section 20 at CBRE-WINCE 000138-139; Ex. 8/Wince Dep. Ex. 8, Section 20 at CBRE-WINCE 000176-77; Ex. 49/Nash Decl. ¶¶ 4-5; *see also* Ex. 1/Wince Dep. 199:15-200:5; Exs. 19, 20/Wince Dep. Exs. 19, 20.)

29.     The CBA contained a section regarding six observed holidays—New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day—for which employees would be paid double time and a half if they worked. (Ex. 1/Wince Dep. 82:24-83:18, 112:11-17, 122:8-16; Ex. 6/Wince Dep. Ex. 6, Section 20 at CBRE-WINCE 000103-104; Ex. 7/Wince Dep. Ex. 7, Section 21 at CBRE-WINCE 000139-140; Ex. 8/Wince Dep. Ex. 8, Section 21 at CBRE-WINCE 000177; Ex. 49/Nash Decl. ¶¶ 4-5.)

**D. Promotions.**

30.     The 2010 CBA provided the following in its entirety related to promotions and transfers:

PROMOTIONS AND TRANSFERS

An employee who is promoted or transferred as a result of a job bid, will be granted a trial period of up to (90) calendar days to demonstrate competency in performance. Once the Employee satisfactorily completes the trial period, the Employer will notify the Employee as such in writing. Upon transfer, the employee will be expected to satisfactorily perform the duties required at the completion of the trial period. If the employee is unable to perform the duties satisfactorily, or the employee voluntarily requests within the trial period, they shall be returned to their former job classification, preferably in their former Building.

(Ex. 1/Wince Dep. 79:15-20: Ex. 6/Wince Dep. Ex. 6, Section 12 at CBRE-WINCE 000100.)

31.     The 2015 and 2018 CBAs contained the same language regarding promotions, set forth a process for filling vacancies following a re-bid process, and stated the following in relation to filling Chief Engineer and Assistant Chief Engineer ("ACE") roles (and, in the 2018 CBA only, Lead Engineers):

Vacancies for Chief Engineer and Assistant Chief Engineer [and Lead Engineer (2018 CBA)] will be filled based on qualifications, skills and ability to perform the job, as determined by the Employer. … If a vacancy for Chief Engineer or Assistant Chief Engineer [or Lead Engineer (2018 CBA)] occurs, and the Employer does not select an employee to fill the position, the Employer may fill the vacancy from outside the bargaining unit.

(Ex. 1/Wince Dep. 99:14-100:1, 100:19-6, 107:7-17, 120:15-121:3; Ex. 7/Wince Dep. Ex. 7, Section 13 at CBRE-WINCE 000134-36; Ex. 8/Wince Dep. Ex. 8, Section 8 at CBRE-WINCE 000171-73; Ex. 49/Nash Decl. ¶¶ 4-5.)

32.     The Chief Engineer is a bargaining unit role that was responsible "for the safe, economical operation of the Building(s) and for all persons employed under the direction of the Chief Engineer" and the ACE position was a bargaining unit position that was a level below Chief Engineer. (Ex. 1/Wince Dep. 84:24-85:22, 86:3-8, 112:24-113:8, 122:17-21; Ex. 6/Wince Dep.

Ex. 6, Sections 21 and 22 at CBRE-WINCE 000104-105; Ex. 7/Wince Dep. Ex. 7, Sections 22 and 23 at CBRE-WINCE 000140-141; Ex. 8/Wince Dep. Ex. 8, Sections 22 and 23 at CBRE-WINCE 000178; Ex. 49/Nash Decl. ¶¶ 4-5.)

33.     Generally, the progression for internal promotion of Stationary Engineers is first to Lead Engineer, then to Assistant Chief Engineer and then to Chief Engineer. (Ex. 48/Declaration of Sean Holland ("Holland Decl.") ¶ 3.)

34.     Wince applied and was interviewed for a Chief Engineer role in 2016 that was given to then-Controls ACE Hernandez (Hispanic); Wince believes Hernandez was selected because he was "liked" and that Hernandez had less experience, educational background and certifications but admits he does not know Hernandez's educational background or certifications, how long Hernandez had been an ACE, Hernandez's experience prior to joining CBRE in 2013, how Hernandez performed in the interview or who selected Hernandez. (Ex. 1/Wince Dep. 106:13-109:2.)

35.     Holland made the decision to promote Hernandez to Chief Engineer because he had the best qualifications, skills and ability to perform the job among the candidates due to his (1) prior project management experience, which included his work as a Lead Controls Engineer when CBRE hired him in 2010, and his subsequent role as Assistant Chief Engineer of Controls in which he oversaw building automation for all acute care facilities, medical office buildings, child care and development facility and professional office buildings owned by NMH, (2) his strong performance in his Lead Controls Engineer and Assistant Chief Engineer of Controls roles at CBRE, (3) his leadership abilities, and (4) his technical credentials including holding several stationary engineer licenses (City of Chicago, Elgin, National Institute of Power Engineers 4th Class), holding a Metasys certification from Johnson Controls on PMI and extended architecture, and being a licensed auto and diesel mechanic. (Ex. 48/Holland Decl. ¶¶ 4-6, 13.)

36.     Wince applied and was interviewed for a Chief Engineer job in 2016 that was given to Martin Walsh (White); Wince does not know Walsh's qualifications, educational background or certifications or who selected Walsh but believes he was picked because he was White "[b]ecause no one – I had not been promoted to any other positions and I didn't see anyone other than Caucasians being hired for those positions." (Ex. 1/Wince Dep. 108:15-20, 109:3-110:9.)

37.     Holland made the decision to hire Walsh for the Chief Engineer role because he had the best qualifications, skills and ability to perform the job among the candidates due to the leadership and technical engineering skills he developed in his prior work experience as a Chief Engineer for over 14 combined years prior to joining CBRE—including at Hines (a global real estate investment firm) and real estate firm HEARN—, having held prior roles as an engineer, lead engineer and assistant chief engineer at Hines. (Ex. 48/Holland Decl. ¶¶ 7, 13.)

38.     Wince applied for an ACE position on first shift for the Lavin Family Pavilion in 2015 that was given to Andrew Brudniak (White), who was in an ACE role at the time; Wince does not know who selected him or why he was selected. (Ex. 1/Wince Dep. 101:18-102:1, 103:6-104:17.)

39.     Holland, along with a panel that included Jim Collins, John Gory and Ralph Piotrowski, selected Brudniak for the Lavin Family Pavilion ACE position in 2015—which was considered a lateral transfer given that Brudniak already was an ACE—because he had the best qualifications, skills and ability to perform the job among the candidates given (1) that he was already serving in an ACE role at Prentice Women's Hospital and (2) his degrees/certifications as follows: Air Conditioning, Refrigeration & Heating; Boiler Operations I; Universal Refrigerant Transition and Recovery Certification; Refrigeration Light Commercial Certification; and a Chicago Stationary Engineer's License. (Ex. 48/Holland ¶¶ 8-10, 13.)

40. Brudniak left and then returned to his role in 2016 and while Wince believes that Brudniak was asked to come back "knowing that … he was Caucasian, white, I'm black", he does not know why Brudniak came back or how Brudniak performed in the role and was not present during any conversation in which Brudniak was asked to return to his role. (Ex. 1/Wince Dep. 104:18-105:5, 105:11-24, 106:1-6.)

41. In 2016, there was a rebid process involving several bargaining unit positions including Brudniak's ACE position; Brudniak bid for the position and was selected by Holland and a panel that included Jim Collins, John Gory and Ralph Piotrowski because Brudniak had the best qualifications, skills and ability to perform the job among the candidates given his previous work in the role, his prior work experience, and his credentials. (Ex. 48/Holland Decl. ¶¶ 11-13.)

42. Kelvin Higginbotham (Black) was promoted to Assistant Chief Engineer in 2018 and there were two other Black ACEs including Stan Freeman and Adrian King on the NMH account. (Ex. 1/Wince Dep. 110:10-22, 209:2-210:6.)

**E. Project Management Course.**

43. Pierz encouraged Wince to take a project management course, toward which Wince completed one class at the University of Chicago in June 2018. (Ex. 1/Wince Dep. 18:18-19:16, 20:12-21:12, 274:13-18; Exs. 41, 42/Wince Dep. Exs. 43, 44.)

44. Wince did not take any more courses because he needed overtime to pay for the course; overtime records for 2018 show Wince was offered 830.5 hours of overtime and accepted 56. (Ex. 1/Wince Dep. 22:9-15, 211:7-212:8, 274:4-12; Ex. 24/Wince Dep. Ex. 24; Ex. 50/Ward Decl. ¶¶ 3, 4, 6.)

45. CBRE approved the cost of the course (which was reimbursed by NMH pursuant to a CBRE agreement with NMH) in the amount of $1,250 and Pierz wrote when also requesting approval of an unscheduled PTO for Wince in connection with the course: "I am a big supporter

in folks seeking further training/education and would like to try to accommodate his request…" (Ex. 1/Wince Dep. 22:16-20, 24:1-2, 268:8-271:23; Exs. 41, 42/Wince Dep. Exs. 43, 44; *see also* Ex. 49/Nash Decl. ¶ 9.)

### F. PTO and Holidays

46.     Wince submitted a Vacation Request Form for 2016 in which all of the boxes asking what holidays he wanted off were checked "no" except New Year's Day, and his request was responded to on May 3, 2016 via email from Assistant Facilities Manager Nathaniel Ward (who did most of the scheduling and vacation time) informing him that he was approved pending overtime coverage and Wince ended up having New Year's Day off. (Ex. 1/Wince Dep. 182:21-22, 183:16-20, 186:8-11, 190:18-191:7, 192:2-193:3, 194:23-196:23, 202:19-203:4; Exs. 18, 19, 22/Wince Dep. Exs. 18, 19, 22; Ex. 50/Ward Decl. ¶¶ 1-2, 26-29.)

47.     Wince submitted a Vacation Request Form for 2017 in which he checked "yes" for wanting off all of the holidays and also put down dates for alternate days off next to those holidays. (Ex. 1/Wince Dep. 198:7-199:3; Ex. 20/Wince Dep. Ex. 20; Ex. 50/Ward Decl. ¶ 26.)

48.     On February 15, 2017, Ward sent an email to Wince informing him that he was approved for all alternate days off he requested other than December 31, 2017 because the "[a]lternate day must be in the same pay period or the following pay period." (Ex. 1/Wince Dep 201:16-202:18; Ex. 21/Wince Dep. Ex. 21.)

49.     Wince believes the seniority provision of the collective bargaining agreement was violated with respect to the vacation he was awarded and on March 27, 2017, Wince filled out a grievance stating, inter alia:

> Upon filling out my vacation request for 2017, I indicated or filled out the yes box for all holidays that are acknowledged for 2017. I also filled out the alternate days off in case I had to work acknowledged holidays. After viewing the master schedule I realized a co-worker with less seniority was granted some holidays off for 2017 and I was granted no holidays off.

I would like to have the requested holidays off that were given to the co-workers with less seniority. The days are as follow[s]: Labor Day- 9/4/17, Christmas 12/25/17 and New Year's 1/1/17.

(Ex. 1/Wince Dep. 203:24-204:2, 204:24-205:16, 205:24-206:4; Ex. 23/Wince Dep. Ex. 23.)

50.      On April 3, 2017, Piotrowski informed Wince that he was denying the grievance because Wince filled out his PTO request to work alternate dates in lieu of the holidays; Wince does not know if anyone filled out the forms the way he did or how CBRE handled similar requests, nor did he allege the decision to deny him holidays was based on his race. (Ex. 1/Wince Dep. 106:5-9, 219:24-220:3, 220:22-221:18; Exs. 23, 26/Wince Dep. Exs. 23, 26.)

51.      After Wince asked to take his grievance to the next step, it was denied as untimely and the Company informed Wince that if the opportunity arose to grant time off without an adverse effect on other employees and without the requirement of overtime payments to cover the time-off, the Company would consider making this time available but it would not adversely impact employees whose schedules already had been approved. (Ex. 1/Wince Dep. 221:22-223:23; Exs. 26, 27/Wince Dep. Exs. 26, 27.)

52.      On August 4, 2017, Ward reached out to Ciaran Officer (White)—the individual Wince was referring to in his grievance as having less seniority but who was granted some holidays off—to see if he would swap Labor Day, Christmas Day or New Year's Day with Wince but Officer declined stating that he had already made plans. (Ex. 1/Wince Dep. 205:17-20, 223:16-224:13; Exs. 23, 28/Wince Dep. Exs. 23, 28.)

53.      On August 30, 2017, CBRE's Director of Human Resources informed the Union that the Company would allow Wince to select Labor Day, Thanksgiving Day, Christmas Day or New Year's Day off and would have another employee work the holiday but would only do this for one holiday because the alternate coverage required premium pay. (Ex. 1/Wince Dep. 224:17-227:12; Ex. 29/Wince Dep. Ex. 29.)

54.     In settlement of his grievance, Wince selected Labor Day off and when the Union asked that he also be allowed to be off on September 5, 2018 (the alternate date Wince had originally requested), he was allowed to take off both days. (Ex. 1/Wince Dep. 227:10-233:8; Ex. 25/Wince Dep. Ex. 25, at Cells GY-10 and GZ-10; Ex. 50/Ward Decl. ¶¶ 7, 26.)

55.     Wince subsequently requested Christmas and New Year's Day off and on December 20, 2017, Ravelo wrote Wince an email reminding him that (1) his grievance was resolved by allowing him 2 days of PTO around the Labor Day holiday, (2) as previously communicated, additional PTO requests would be considered that would not create the need for overtime coverage, and (3) Wince's then-current requests for December 25 and January 1 off could not be accommodated without overtime coverage, to which Wince responded: "Enjoy your holiday! Confirmed". (Ex. 1/Wince Dep. 233:22-236:11; Ex. 30/Wince Dep. Ex. 32.)

56.     The following black Stationary Engineers had more seniority than Wince and had Christmas off in relation to the 2017 holiday schedule: Mark Jackson was given the day off and John Morris was not scheduled to work. (Ex. 1/Wince Dep. 206:13-209:1, 214:10-215:6, 216:3-20, 218:7-219:19; Exs. 24, 25/Wince Dep. Exs. 24, 25; Ex. 50/Ward Decl. ¶¶ 3-4, 7.)

57.     In relation to the 2018 holiday schedule, Wince completed his Vacation Request Form and requested all of the holidays off and on February 15, 2018, Wince was informed he was denied the holidays due to insufficient coverage (Ex. 1/Wince Dep. 236:19-24, 238:19-239:5; Exs. 31, 32/Wince Dep. Exs. 33, 34; Ex. 50/Ward Decl. ¶ 26.)

58.     The following black Stationary Engineers with more seniority than Wince had the following holidays off in relation to the 2018 holiday schedule: (1) Memorial Day (May 28, 2018) – Ruthla Robertson, (2) Independence Day (July 4, 2018) - Robertson ; (3) Labor Day (September 3, 2018) – Morris was not scheduled to work; (4) Thanksgiving Day (November 22, 2018) – Robertson and Jackson; (5) Christmas (December 25, 2018) – Robertson and Jackson; (6) New

Year's Day (January 1, 2019) – Morris, Robertson and Jackson. (Ex. 1/Wince Dep. 206:13-209:1, 239:12-245:19; Exs. 24, 33/Wince Dep. Exs. 24, 35; Ex. 50/Ward Decl. ¶¶ 3-4, 9.)

59. In relation to the 2019 holiday schedule, Wince requested Independence Day, Labor Day, Christmas Day and New Year's Day and on February 15, 2019, Ward sent Wince an email informing him that he was approved for New Year's Day on January 1, 2020 but was denied the other 3 holidays (Independence Day, Labor Day and Christmas) due to insufficient coverage. (Ex. 1/Wince Dep. 246:1-5, 246:16-247:9; Exs. 34, 35/Wince Dep. Exs. 36, 37; Ex. 50/Ward Decl. ¶ 26.)

60. The following black Stationary Engineers with more seniority than Wince had the following holidays off in relation to the 2019 holiday schedule: (1) Independence Day (July 4, 2019) – Morris and Jackson (Robertson was on a leave of absence); (2) Labor Day (September 2, 2019) – Morris and Robertson; and (3) Christmas (December 25, 2019) – Morris, Robertson, and Jackson. (Ex. 1/Wince Dep. 247:13-250:1; Exs. 24, 36/Wince Dep. Exs. 24, 38; Ex. 50/Ward Decl. ¶¶ 3-4, 30.)

61. Wince believes that the decision not to give him PTO and holidays was based on his race because he knew of others (whose names he could not recall) "being offered the holidays off behind closed doors that were of Caucasian descent or white" but he does not know who made the final decisions with respect to awarding or denying him PTO and holidays. (Ex. 1/Wince Dep. 200:8-201:12, 251:6-252:2.)

### G. Overtime.

62.     Wince believes that he was unfairly denied overtime in Controls on eighteen (18) occasions in 2018, which was awarded to engineers in Controls as follows:

| 2/11 | Ade Alohan (Black) | 2/18 | Dan Ryan | 3/10 | Bernard McNeela |
|---|---|---|---|---|---|
| 4/15 | Humphrey Phillips (Black) | 5/27 | Humphrey Phillips (Black) | 5/28 | Ade Alohan (Black) |
| 6/22 | No Controls overtime awarded | 6/23 | Humphrey Phillips (Black) | 7/3 | No Controls overtime awarded |
| 7/4 | No Controls overtime awarded | 7/27 | Elaine O'Brien | 7/28 | Bernard McNeela |
| 8/11 | Bernard McNeela | 8/18 | Bernard McNeela | 9/14 | No Controls overtime awarded |
| 10/19 | No Controls overtime awarded | 11/11 | Elaine O'Brien | 11/12 | Elaine O'Brien |

(Ex. 1/Wince Dep. 92:14-15, 259:8-14, 263:1-5, 267:22-268:4, 302:10-22, 303:8-9; Exs. 24, 25, 33, 37, 40/Wince Dep. Exs. 24, 39, 33, 35, 42; Ex. 50/Ward Decl. ¶¶ 3-25.)

63.     Wince filed a grievance because he believed it was a violation of the CBA that individuals who were officially in the Controls area were given overtime opportunities in that group over him because Controls was not mentioned as a specific work group in the CBAs; the grievance was denied and Wince does not recall why or whether he pursued it further. (Ex. 1/Wince Dep. Ex. 260:15-21, 261:5-263:18, 264:15-265:7, 266:3-267:12; Exs. 38, 39, 40/Wince Dep. Exs. 40, 41, 42.)

### H. Bonuses.

64.     In 2018, there was a change in the bonus incentive program and all employees represented by the Union in Work Group 1—including Wince—received an annual bonus of $879.38 while Work Groups 2 and 3 received higher amounts of $1,096.38 and $1,058.08,

respectively. (Ex. 1/Wince Dep. 276:15-278:15; Exs. 43, 44/Wince Dep. Exs. 47, 48; Ex. 49/Nash Decl. ¶¶ 6-7.)

65.  For 2019, the bonus incentive program was modified so that all work groups received the same bonus and all employees in Work Group 1—including Wince—received an annual bonus of $824.05. (Ex. 1/Wince Dep. 278:24-280:1; Ex. 45/Wince Dep. Ex. 49; Ex. 49/Nash Decl. ¶ 8.)

### I.  PTO.

66.  On March 4, 2019, Wince sent an email regarding his belief that his PTO balance was inaccurate and, after meeting with Human Resources Business Partner Nash (Black), believes they could never figure out how much he was owed. (Ex. 1/Wince Dep. 281:2-283:16, 284:5-11, 295:4-8; Ex. 49/Nash Decl. ¶ 9; Ex. 46/Wince Dep. Ex. 50.)

67.  Wince believes that how the PTO was calculated was a violation of the CBA and said it was "possible" that it was based on his race but does not know if anyone else had similar issues one way or the other. (Ex. 1/Wince Dep. 284:15-285:4.)

### J.  Individual Defendants.

68.  Wince believes it was discriminatory that Pierz told him they did not have any leadership positions for him and he probably would be better off looking outside of CBRE where they had immediate project manager positions open, which is why he enrolled in the project management course; he does not know if Pierz had similar conversations with others. (Ex. 1/Wince Dep. 287:12-288:2, 289:1-17.)

69.  He also believes Pierz was responsible for denying him overtime but has no specific knowledge that he was involved in that decision. (Ex. 1/Wince Dep. Ex. 288:4-24.)

70.  Saulig once said to Wince in a meeting: "we don't like you" but Wince does not know if he said that to anyone else and although Wince believes Saulig was involved in decisions

not to promote him in 2015 and 2016, he has no evidence that he was. (Ex. 1/Wince Dep. 289:22-291:23.)

71.     Holland was "supposed to be a mentor" and there were times Wince went to him about his PTO or being promoted and was "never acknowledged"; Wince does not know how he responded to other employees when they went to him with similar issues. (Ex. 1/Wince Dep. 291:24-292:9)

72.     In relation to Ravelo, (1) he took a month to resolve an issue where Wince was mistakenly identified as a retired employee who had the same first name (Wince did not suffer a loss of pay and does not know if a similar mistake was made with others) and (2) Wince believes that he was involved in denying him the Chief Engineer role in 2018 but does not have any specific evidence of that. (Ex. 1/Wince Dep. 68:13-69:15, 292:13-294:4)

73.     Hernandez tried to make Wince's record look bad through the verbal warning and then tried to reprimand him once for not repairing something left from someone on the prior shift (Wince did not get disciplined); while Hernandez was "friendly" with the Caucasian engineers, Wince "can't remember" if he made others repair things left from other shifts. (Ex. 1/Wince Dep. 294:5-295:3).

74.     Wince believes in 2018 or 2019, he was given unfair work assignments at the trainee level because he was African American while the trainee was given his assignment; he did not suffer a loss of pay, he cannot estimate how many times or why this happened, he believes Hernandez was involved and that he had more seniority so it should not have happened. (Ex. 1/Wince Dep. 296:20-299:6.)

75.     Wince believes it was discriminatory that he had to do maintenance work that he should not have had to do based on his seniority and said eventually they started rotating people

and that some of this work was given to a white engineer (who was a trainee). (Ex. 1/Wince Dep. 299:7-301:6.)

76.     Wince also believes Nash discriminated against him because a manager Frank (last name unknown) once yelled at Wince, which Wince reported to Nash who came back to him to say that he had a tough day and to excuse his mannerism but Wince does not know if Frank was ever disciplined. (Ex. 1/Wince Dep. 295:4-296:4.)

### K. Discriminatory Comments.

77.     Wince never heard any inappropriate racial remarks while employed at CBRE; in 2016 or 2017, the "N-word", "you don't belong", "we don't want you here" was written on Wince's lunchbox and he blotted it out, does not know who did it and never told anyone about it at CBRE. (Ex. 1/Wince Dep. 285:5-22, 286:13-287:11.)

78.     Coworkers (including an African American coworker) and management (including Hernandez) called him "Sly" because it "was easier to remember [him] by" but eventually stopped after he told them that he did not like being called that. (Ex. 1/Wince Dep. 10:23-11:17, 12:3-13:7, 302:10-303:9.)

79.     Wince believed the name "Sly" was racially derogatory because "[w]hen you think of someone as Sly, you think of someone sneaky or like a – you know, like someone that's trying to do something on – you know, not honest", but Wince did not tell anyone at CBRE that he believed that. (Ex. 1/Wince Dep. 13:8-15, 15:22-16:1, 301:7-12, 302:10-304:2; Ex. 47/Wince Dep. Ex. 51.)

### L. Resignation.

80.     Wince started working as a HVAC supervisor for TL Services at the Hines VA Hospital on October 26, 2019; he quit his job at CBRE to take this position because he "received

a higher level of what [he] was doing, meaning that [he] was in a high role position." (Ex. 1/Wince Dep. 30:12-14, 31:8-12, 33:7-34:5.)

Respectfully submitted,

Dated:  May 5, 2021

By: s/Jill S. Vorobiev
Jill S. Vorobiev (6237734)
Amy I. Harwath (6324021)
REED SMITH LLP
10 South Wacker Drive, Suite 4000
Chicago, IL  60606
Tel: (312) 207-1000
Fax:  (312) 207-6400
Email:  jvorobiev@reedsmith.com
Email:  aharwath@reedsmith.com

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 5, 2021, the foregoing *Defendants'*
*Statement of Material Facts as to Which There is No Genuine Issue* was filed through the Court's
CM/ECF system, which shall send notification of such filing to all counsel of record at their
email addresses on file with the Court.


s/Jill S. Vorobiev _____
One of the Attorneys for Defendants