## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SYLVESTER D. WINCE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-1546 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CBRE, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sylvester Wince worked as a Stationary Engineer at Defendant CBRE, Inc. for over 17 years. He helped keep the building of Northwestern Memorial Hospital up and running. For the last few years, his job frustrated him. He didn't receive the promotions he wanted. He thought that the company denied him overtime, holiday leave, paid time off, and tuition reimbursements. And he felt like his coworkers disrespected him with racist language and inappropriate nicknames. So, he eventually quit.

Wince later sued CBRE and several of his managers. He alleges that they discriminated against him because he is black, and that they retaliated against him because of his complaints about racism, including a complaint to the EEOC. After discovery, Defendants moved for summary judgment.

For the reasons stated below, Defendants' motion is granted.

### Background

#### I.    Wince and CBRE

Plaintiff Sylvester Wince started working in the facilities department at Northwestern Memorial Hospital in 2001. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 141).

Wince is black. *Id.* at ¶ 4. Wince is one of the people who work hard behind the scenes to keep a large building up and running.

In October 2010, the hospital contracted the facilities department out to Defendant CBRE, Inc., who hired Wince as a "Stationary Engineer." *Id.* Stationary Engineers provide a range of services, including preventative maintenance and urgent and routine repairs on all sorts of equipment throughout the hospital campus. *Id.* at ¶ 8. Stationary Engineers try to prevent problems from happening, but when they do happen, they make sure that the problems get fixed.

Wince has a number of credentials in his field. In 2001, the year that CBRE hired him, Wince received a bachelor's degree in organizational behavior from Northwestern University. *Id.* at ¶ 10. He is licensed as a Stationary Engineer with the City of Chicago. *Id.* And he holds several relevant certifications, including Basic Electricity 1, Refrigeration 1 and 2, and Indoor Air Quality 1 and 2. *Id.*

Despite his qualifications, Wince didn't have the best reviews right off the bat. In his 2011 annual performance review, Wince received a rating of 2 out of 4.[1] *Id.* at ¶ 11; *see also* 2011 Manager Evaluation (Dckt. No. 121-2, at 154–57 of 216). Because of his poor review, Wince's manager at the time (Mike Carroll) placed him on a performance improvement plan. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 141); Performance Improvement Plan (Dckt. No. 121-2, at 159–60 of 216).

---

[1] Wince attempts to dispute this fact. Wince argues that he is not sure that he had a 2011 review. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 141). He cites his deposition where he testified that he does not remember if he received an evaluation in 2011 and thought that a copy of the evaluation may be inauthentic. *See* Wince Dep., at 344:20 – 346:15 (Dckt. No. 121-1, at 114 of 181). But earlier in his deposition, he remembered receiving and acknowledging the review. *Id.* at 128:10-12. And the evaluation suggests that he acknowledged it, too. *See* 2011 Management Evaluation (Dckt. No. 121-2, at 157 of 216). So, Wince only has evidence that he does not *remember* receiving an evaluation, while Defendants provided evidence that he did receive one.

Later, Wince became involved in a race-related incident experienced by another employee. His former colleague, Charles Wilson, accused CBRE of discrimination in 2013 or 2014. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 1 (Dckt. No. 137). An outside attorney for CBRE questioned Wince about discrimination in the workplace. *Id.*; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 19 (Dckt. No. 141). Wince told the attorney that he believed that the company discriminated based on race, such as denying promotions to black employees. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 1; Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 19.

In his complaint, Wince claims that he suffered race discrimination in a number of different ways during his time at CBRE. He claims that he experienced issues with promotions, overtime, holidays, paid time off, bonuses, and tuition reimbursements, among other problems. He also contends that he was subjected to offensive language from his coworkers.

His claim includes a lot of different components, meaning different types and different episodes of alleged discrimination. So the Court will walk through them, one at a time.

## II.     Promotions

The first aspect of the claim involves the lack of promotions.

In 2015 and 2016, Wince applied for, but did not receive, four promotions. None of the individuals who received the promotions were black. Wince claims that each denial of a promotion was a discrete example of race discrimination. And he alleges that, when viewed together, they paint a picture of race discrimination.

Wince applied for two positions: Chief Engineer and Assistant Chief Engineer. He applied for each position twice, for a total of four attempts.

According to the 2010 Collective Bargaining Unit,[2] the Chief Engineer is a bargaining unit position. The Chief Engineer is responsible "for the safe economical operation of the Building(s) and for all persons employed under the direction of the Chief Engineer." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 32 (Dckt. No. 141). The Assistant Chief Engineer is a bargaining unit position one level below the Chief Engineer. *Id.*

There are different rungs in the ladder, with Stationary Engineer on the bottom and Chief Engineer on the top. The general progression for the internal promotion of Stationary Engineers is first to Lead Engineer, and then to Assistant Chief Engineer, and then to Chief Engineer. *See* Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 123); Holland Dec., at ¶ 3 (Dckt. No. 121-6, at 43 of 216).

Wince was a Stationary Engineer. So, his applications for Assistant Chief Engineer and Chief Engineer required him to skip a step or two.[3] Nevertheless, he applied for each position twice. He never got the jobs.

---

[2] The parties argue over the authenticity of the CBAs that govern the employment actions in this case. In the end, the admissibility of the CBAs doesn't affect the Court's decision. The outcome would not change if the CBAs were admissible or inadmissible. But the Court does offer findings on which CBAs it can consider. Defendants point to three CBAs. *See* Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 123). The first is from 2010, the second is from 2015, and the third is from 2018. *Id.* Defendants can only rely on admissible evidence for summary judgment, so Wince or someone else must authenticate the CBAs. The parties dispute authenticity, but the dispute stems from Wince's own contradictory testimony. During questioning by defense counsel, Wince reviewed the CBAs, confirmed that he was familiar with each one, and answered questions about them. *See* Wince Dep., at 72:4-24, 94:12 – 95:3, 118:15-24 (Dckt. No. 121-1, at 20, 26 of 181). Then, when questioned by his own lawyer, Wince backpedaled. He answered questions about the 2010 CBA, confirming its authenticity. *Id.* at 338:6 – 339:17. But, then he expressed doubt that he could authenticate the 2015 or 2018 CBAs. *Id.* at 339:21 – 343.9. Wince never recanted his testimony about the 2010 CBA, and Defendants provided a declaration to authenticate the 2018 CBA. *See* Nash Dec., at ¶¶ 4–5 (Dckt. No. 121-6, at 52 of 96). So, the 2010 and 2018 CBAs are admissible evidence. But the 2015 CBA is left in limbo by Wince's wavering testimony. Defendants may not rely on the 2015 CBA to succeed at this stage.

[3] Wince disputes that any progression existed, arguing that "CBRE managers could promote anyone they wanted to any position." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 141). But he doesn't have any citation for that position. He argues that Brudniak skipped ahead "from Service Engineer to Assistant Chief Engineer in April of 2016." *Id.* But Brudniak moved laterally (from

---

4

The first attempt at a promotion took place in 2015. Wince applied for an Assistant Chief Engineer position on the first shift for the Lavin Family Pavilion. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 38 (Dckt. No. 141). Instead, management hired Andrew Brudniak, who is white. *Id.*

The second attempt involved the same position. At some point in 2016, Brudniak left the position (and maybe the company, but the parties don't say), but later came back. *Id.* at ¶ 40. There was a rebid process involving several different bargaining unit positions, including Brudniak's Assistant Chief Engineer position. *Id.* at ¶ 41. Brudniak bid for his old position, and a panel selected him. *Id.* So Brudniak got his old job back.

The parties agree that Sean Holland (a white man) played a role in the decision to not promote Wince for that position. At the time, Holland was the Director of Facilities, and was responsible for hiring individuals into leadership roles. *See* Holland Dec., at ¶ 2 (Dckt. No. 121-6, at 43 of 216). But the parties disagree about who else was involved.

Wince believes that, in addition to Holland, Defendants Richard Saulig and Pedro Ravelo (both white men) played a role in keeping him from getting the job. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 38 (Dckt. No. 141); Wince Dep., at 318:19 – 320:3 (Dckt. No. 121-1, at 107–08 of 181). (The parties do not provide any information on Saulig's or Ravelo's positions at CBRE.)

According to Wince, Saulig didn't like him. Wince testified that during a meeting, when Wince was the only black individual in the room, Saulig "blurted out that we don't like you." *See* Wince Dep., at 289:24 – 290:12 (Dckt. No. 121-1, at 100 of 181). But that interaction is untethered to the chronology. The parties do not reveal when, exactly, that incident happened. It

---

Assistant Chief Engineer to Assistant Chief Engineer). *See* 4/22/16 Email (Dckt. No. 135-4, at 84 of 97). He didn't skip any steps or receive a promotion out of the typical order.

is not clear if it happened before, or after, or contemporaneous with the decision to hire Brudniak. The parties simply say that it happened "once . . . at a meeting." *See* Pl.'s Resp. to Defs.' Statement of Fact, at ¶ 70 (Dckt. No. 141).

Wince believes that Ravelo played a role in the decision, too. But Wince admitted that he had no specific evidence about Ravelo's involvement. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 72 (Dckt. No. 141). Wince presented no evidence that Ravelo disliked Wince, or otherwise had any animus toward him at all.

CBRE paints a different picture about who played a role in the decision to hire Brudniak instead of Wince. Holland testified that he, Jim Collins, John Gory, and Ralph Piotrowski selected Brudniak for the job. *See* Holland Dec., at ¶ 9 (Dckt. No. 121-6, at 36 of 96). Holland explained the reasons for hiring, and later rehiring, Brudniak for that position. "Brudniak was already an [Assistant Chief Engineer]," and he "also had the best qualifications, skills and ability to perform the job among the candidates because of his previous work experience and performance." *Id.* at ¶ 10; *see also id.* at ¶ 12.

In 2016, Wince made his third attempt. Undeterred by his denial of the Assistant Chief Engineer promotion, Wince applied for Chief Engineer. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 141). He received an interview, but ultimately the job went to Defendant Jose Hernandez, who is Hispanic. *Id.* At the time, Hernandez was a Controls Assistant Chief Engineer, so he was two rungs of the ladder above Wince. *Id.*

Wince argues that CBRE promoted Hernandez only because he was "liked." *Id.* at ¶¶ 34–35. In his deposition, Wince also expressed a belief that CBRE promoted Hernandez because he was not black. *See* Wince Dep., at 319:11-18 (Dckt. No. 121-1, at 29, 108 of 181). But that fact does not appear in the Rule 56.1 statement. *See* L.R. 56.1(d).

In his deposition, Wince claimed that Hernandez had less experience, education, and certifications than he did. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 141). Yet, when asked, Wince admitted that he didn't know (1) Hernandez's educational background or certifications; (2) how long Hernandez had been an Assistant Chief Engineer; (3) his prior experience before joining CBRE in 2013; (4) how he performed in his interview; or (5) who selected him for the job. *Id.*

The record includes evidence about why CBRE hired Hernandez. Holland testified about Hernandez's prior work experience (*e.g.*, at Johnson Controls), as well as his licenses and certifications. Holland confirmed that Hernandez "had the best qualifications, skills and ability to perform the job among the candidates." *See* Holland Dec., at ¶¶ 4–6 (Dckt. No. 121-6, at 35 of 96).

Wince made his fourth attempt at a promotion later that year. Wince applied for the Chief Engineer position a second time. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 36 (Dckt. No. 141). He received an interview, but the job went to Martin Walsh, who is white. *Id.*

Wince believes that CBRE chose Walsh because he is white. *Id.* Wince based that belief on the fact that he "had not been promoted to any other positions and [he] didn't see anyone other than Caucasians being hired for those positions." *See* Wince Dep., at 110:5-9 (Dckt. No. 121-1, at 30 of 181). But when pressed on Walsh's prior experience or qualifications for the job, Wince knew nothing. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 36 (Dckt. No. 141); Wince Dep., at 109:13 – 110:2.

Holland explained why he hired Walsh. In his view, "Walsh had the best qualifications, skills and ability to perform the job among the candidates because of the leadership and technical engineering skills he developed in his prior work experience." *See* Holland Dec., at ¶ 7 (Dckt.

No. 121-6, at 36 of 96). Holland also noted that Walsh worked "for a total of over 20 years in engineer, lead engineer, Assistant Chief Engineer, and Chief Engineer roles." *Id.* Importantly, he worked as a Chief Engineer for 14 years at two different real estate firms before moving to CBRE. *Id.*

Above and beyond the qualifications of the other candidates, Holland gave another reason why Wince didn't get a promotion. "Sylvester Wince was not selected for any of the above-referenced roles because he did not have more than the basic qualifications and certifications to perform the work that any general Stationary Engineer could be assigned." *See* Holland Dec., at ¶ 13 (Dckt. No. 121-6, at 37 of 96).

Sometime in 2017, Wince complained to CBRE's Ethics Hotline that he was not promoted because he is black. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 2 (Dckt. No. 137). He is not sure what, if anything, CBRE did with that complaint. *Id.*

## III. Overtime

Wince also contends that the company deprived him of overtime. He believes that the company unfairly denied him overtime on 18 occasions in 2018. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 62 (Dckt. No. 141).

The alleged denials involve Wince's work in the so-called "Controls" area. (The parties do not reveal what the "Controls" area does.) Wince worked in Controls from 2015 or 2016 until November 23, 2016.[4] *Id.* at ¶ 9. He also worked there afterwards, as necessary. But when CBRE denied his overtime, Wince was no longer officially in Controls.

---

[4] Wince disputes that he worked in Controls "to the extent that there was no such thing as 'controls' area according to the CBA." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 9 (Dckt. No. 141). But Wince does not dispute that he worked in a position known (at least informally) as the Controls group.

Wince believes that the company failed to pay him overtime on 18 specific days. (The record includes a chart.) *Id.* at ¶ 62. On 5 of the 18 days, no one in Controls received overtime. *Id.* So, on 13 of the 18 days in question, someone else in Controls received overtime (one person, per day), but Wince did not. *Id.* Some of those employees were black, and others were not. A black employee received overtime on 5 of the 13 days. *Id.*

In other words, Wince claims that he should have gotten overtime on 18 days. On 5 of the 18 days, a black employee got overtime. On 8 of the 18 days, a non-black employee got overtime. On 5 of the 18 days, no one got overtime.

Wince argues that his overtime denial violated the CBA. *Id.* at ¶ 63. Specifically, he was upset because the individuals who received overtime were all in the Controls area, but the CBA did not mention Controls as a specific work group. *Id.* Wince does not fully explain why it matters that Controls was not in the CBA. But the Court infers that, because CBRE gave overtime to people in a group not found in the CBA, Wince thought something fishy was happening with the overtime assignments.

So, Wince filed a grievance. *Id.* But his grievance didn't make it far. It was denied, and Wince does not recall whether he pursued it further.[5] *Id.*

## IV. Holidays

Wince also raised an issue with how Defendants handled his requests for holiday leave. He believes that Defendants repeatedly denied his holiday requests because he is black.

---

[5] Wince argues that he did request to take his grievance to the next level. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 63 (Dckt. No. 141). But his evidence shows a request to take a grievance about paid time off – not overtime – to the next level. *See* 4/3/17 Emails (Dckt. No. 135-3, at 54–55 of 100). So, Defendants' fact that Wince did not recall whether he pursued his grievance further is admitted as uncontroverted by specific evidence. *See* L.R. 56.1(e)(3).

As an aside, in the initial status report filed after reassignment (*i.e.*, when the case was reassigned from Judge Kennelly), Plaintiff's counsel made a startling statement. She represented that Wince had "applied for holiday time off, but in 17 years he has never been allowed holiday time off for Christmas Eve, Christmas Day, July 4th, New Year's Eve or New Year's Day." *See* Initial Status Report for Reassigned Case, at 2 (Dckt. No. 38). This Court drew attention to that assertion at the very first hearing (and it prompted a sidebar to discuss the case). That representation, it seems, did not pan out. There is no such evidence in the record.

Taking a step back, the record doesn't include much information about what percentage of employees can take the day off for a holiday. A large hospital requires people there, presumably every hour of every day. The hospital can't take the day off, so the building can't take the day off, so (presumably) some employees can't take the day off, either. Everyone can't take the day off on a holiday, but *some* can. This Court does not know how likely it would be for any particular employee to get the day off for any particular holiday. Some employees get the day off, others can't.

Wince submitted a Vacation Request Form for 2016, and he checked "No" for every holiday, meaning that he didn't want the day off, except New Year's Day. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 141).[6] Wince received an email on May 3, 2016, from Assistant Facilities Manager Nathaniel Ward, who approved his request for a vacation day on New Year's Day, pending overtime coverage. *Id.* So, he requested a vacation day for only one holiday, and got it.

---

[6] Wince "questions the validity of this form because it doesn't make sense that he would not want any holidays off in 2016." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 141). That may be so, but he offers no testimony or other evidence that places the validity of the form into question. And Defendants provided a declaration that authenticated the forms. *See* Ward Dec., at ¶ 26 (Dckt. No. 121-6, at 96 of 96).

In his 2017 Vacation Request Form, Wince checked "Yes" for every holiday, meaning that he wanted to take the day off, and he also put down dates for alternate days off next to those holidays. *Id.* at ¶ 47. On February 15, 2017, Ward informed Wince that he received the alternate days that he had requested, other than the alternate day for December 31, 2017, because an "[a]lternate day must be in the same pay period or the following pay period." *Id.* at ¶ 48.

Wince believed that the approval of only alternate days (*i.e.*, no holidays) violated the CBA. *Id.* at ¶ 49. Specifically, he believed that the CBA made clear that holiday vacations should be given based on seniority. *Id.* So, on March 27, 2016, he filed a grievance noting that "a co-worker with less seniority was granted some holidays off for 2017 and I was granted no holidays off," and also that he "would like to have the requested holidays off that were given to the co-workers with less seniority." *Id.*

On April 3, 2017, Piotrowksi denied Wince's grievance. *Id.* at ¶ 50. Piotrowski explained that Wince had filled out his time-off request to work alternate days in lieu of the holidays. *Id.* Wince did not know if anyone filled out the forms the same way that he did, or how CBRE handled similar requests. *Id.* But Wince believed that giving him the alternate days for vacation "was intentional and based on [his] race." *Id.* (quoting Wince Dep., at 361:12-17 (Dckt. No. 121-1, at 118 of 181)).

Wince asked to continue with the grievance and take it to the next step, but the company denied it as untimely. *Id.* at ¶ 51. CBRE informed Wince that if the opportunity arose to grant time off without an adverse effect on other employees and without the requirement of overtime payments to cover the time off, then CBRE would consider making this time available for Wince. *Id.*

11

Meanwhile, on August 4, 2017, Ward reached out to Ciaran Officer, the white, less senior co-worker who Wince complained had received holidays off. *Id.* at ¶ 52. Ward asked if Officer would swap Labor Day, Christmas Day, or New Year's Day with Wince, but Officer declined, saying that he had already made plans. *Id.*

Later that month, CBRE's Director of Human Resources informed Wince's union that CBRE would allow Wince to take off Labor Day, Thanksgiving Day, Christmas Day, or New Year's Day. *Id.* at ¶ 53. CBRE would have another employee work the holiday, but would only do it for one holiday because the alternate coverage required premium pay. *Id.*

Wince chose to take off Labor Day, and his union asked that he be allowed to keep September 5 (the alternate day that he originally received) off, too. *Id.* at ¶ 54. CBRE allowed him to take off both days. *Id.*

But Wince wanted to take off more than two days. So, he requested Christmas and New Year's Day off, too. *Id.* at ¶ 55. The parties dispute what happened next.

Defendants offered evidence that Ravelo emailed Wince on December 20, 2017, reminding him that his two days of paid time off around Labor Day resolved his grievance. *See* Defs.' Statement of Facts, at ¶ 55 (Dckt. No. 123). The email also said that they had previously communicated that any additional requests would not be considered unless they didn't create a need for overtime coverage. *Id.* And, since Christmas and New Year's Day would need overtime coverage, they would not be accommodated. *Id.* Wince responded, "Enjoy your holiday! Confirmed." *Id*; 12/20–21/17 Emails (Dckt. No. 121-4, 36–37 at 92).

Wince argues that he "never received e-mails stating that his grievance was resolved by allowing him 2 days of PTO around the Labor Day Holiday." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 55 (Dckt. No. 141). But his deposition citation isn't on point. There, he

testified that he didn't recall receiving or seeing the emails about "being given Labor Day as compensation for having been denied certain holidays." *See* Wince Dep., at 371:7-17 (Dckt. No. 121-1, at 121 of 181). In other words, Wince testified that he never saw the initial negotiation between the company and the union, not that he did not see the follow-up emails explaining that his grievance had already been resolved.

So, the fact that Wince received the emails on December 20, 2017 is not disputed. But Wince did not appreciate the fact that the company and the union negotiated a resolution of his grievance without his knowledge. He thought that Defendants and his union discussed his grievance without him "because they were doing things behind [his] back and because of [his] being African-American they wasn't open and straightforward." *Id.* at 372:10-13.

In 2018, Wince took a somewhat different strategy toward requesting leave for holidays. In his 2018 Vacation Request Form, Wince once again requested all the holidays off, but apparently did not request any alternate days. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 57 (Dckt. No. 141). On February 15, 2018, Defendants denied his request for leave on the holidays due to insufficient coverage. *Id.*

In 2019, Wince received slightly more holiday time off, but not much. Wince asked to take off Independence Day, Labor Day, Christmas Day, and New Year's Day. *Id.* at ¶ 59. On February 15, 2019, Ward informed Wince that he would get New Year's Day off, but not any of the other three days because of insufficient coverage. *Id.*

Defendants note that black Stationary Engineers with more seniority than Wince received vacation days on holidays instead of him. In 2017, CBRE gave Mark Jackson Christmas off, and didn't schedule John Morris to work. *Id.* at ¶ 56. In 2018, CBRE gave Ruthla Robertson vacation days on Memorial Day, Independence Day, Thanksgiving Day, and Christmas, and

13

gave Jackson Thanksgiving Day and Christmas off. *Id.* at ¶ 58. And CBRE didn't schedule Morris to work Labor Day. *Id.* And in 2019, CBRE gave Robertson vacation days on Labor Day and Christmas, gave Morris vacation days on Independence Day, Labor Day, and Christmas, and gave Jackson Independence Day and Christmas off. *Id.* at ¶ 60.

Regardless, Wince asserts that Defendants did not give him holiday time because of his race. *Id.* at ¶ 61. He testified that he knew of others (but couldn't remember their names) that CBRE "offered the holidays off behind closed doors that were of Caucasian descent or white." *Id.* (quoting Wince Dep., at 200:8 – 201:12, 251:6 – 252:2 (Dckt. No. 121-1, 78, 91 of 181)).

## V. Paid Time Off

Holidays were not the only issue when it came to paid time off. Wince argues that Defendants deprived him of non-holiday time off, also. But the amount is up in the air.

In March 2019, Wince believed that his paid time off balance was inaccurate. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 141). So, he set up a meeting with Defendant Maya Nash, the Human Resources Business Partner. *Id.*

But after the meeting, Wince left thinking that CBRE would never figure out how much he was owed.[7] *Id.* Wince thought that CBRE's calculation of paid time off violated the CBA. *Id.* at ¶ 67.

Wince testified that it was "possible" that it was based on his race. *Id.* But he did not know if anyone else had similar issues, one way or the other. *Id.* There is no evidence in the record that other employees received paid time off, but Wince didn't. And in his brief, Wince does not quantify the amount of paid time off that he should have received, but didn't receive.

---

[7] Wince disputes that he couldn't figure out how much he owned, noting that he "prepared a chart showing how much PTO he was entitled to but CBRE denied it." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 141). But for a cite, he just wrote, "cite needed Wince's chart of missed PTO." *Id.* Suffice it to say, that does not create a genuine dispute. *See* L.R. 56.1(e)(3).

There are significant gaps in the record. Wince never articulates how much paid time off, in his view, he should have received. At best, the record simply includes the assertion by Wince that he didn't receive the right amount of paid time off. And he believes that he didn't receive the full amount because of his race.

## VI. Bonuses

Wince also takes issue with how CBRE handled his employment bonuses. Namely, Wince believes that the company undercompensated him in 2018 and 2019.

In 2018, CBRE changed its bonus incentive program. *Id.* at ¶ 64. (As an aside, the parties never explain how CBRE did bonuses before 2018.) That year, all employees in what the parties call "Work Group 1" (Wince's work group) received an annual bonus of $879.38, while Work Groups 2 and 3 received bonuses of $1,096.37 and $1,058.08, respectively. *Id.*

Wince does not dispute the fact that "all employees represented by the Union in Work Group 1 – including Wince – received an annual bonus of $879.38 while Work Groups 2 and 3 received higher amounts . . . ." *Id.* Wince simply states that "[Defendant Ernie] Pierz was instrumental in having Plaintiff's bonus reduced." *Id.* Pierz was the Director of Facilities at CBRE, but beyond that, the parties give very little information about his role. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 12 (Dckt. No. 137).

Wince does not explain how or why his bonus was reduced. And he never explains how his 2018 bonus could give rise to a discrimination claim when everyone in his Work Group received the same bonus.

Then, in 2019, CBRE shifted the bonus program again. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 65 (Dckt. No. 141). The members of every group received the same bonus: $824.05. *Id.*

So, everyone received the same bonus in 2019. Everyone's bonus went down from 2018 to 2019. Wince received $824.05, and so did everyone else.

Once again, Wince does not dispute those facts, except to add that "Pierz was instrumental in having Plaintiff's bonus reduced." *Id.* at ¶¶ 64–65.

The details beyond Wince's statement about the bonuses are hazy. Wince testified that Pierz made the bonuses "conditioned upon a performance evaluation." *See* Wince Dep., at 316:10-14 (Dckt. No. 121-1, at 107 of 181). But he doesn't reveal how the bonuses were calculated, or how his evaluations factored into his bonus, if at all.

Wince testified that Pierz changed the bonus structure "based on discrimination." *Id.* at 316:20-24. But Wince never explained how this change related to discrimination. It is unclear how Wince could have a discrimination claim if everyone in his Work Group received the same bonus.

## VII.    Tuition Reimbursement

Wince also believes that CBRE denied him a tuition reimbursement in 2018. Basically, Wince believes that CBRE prevented him from taking management courses by denying him overtime. And he believes that CBRE denied him overtime opportunities because he is black.

At some point, Pierz encouraged Wince to take a project management course.[8] *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 141). Wince didn't take the comment as a helpful suggestion, or as an expression of confidence. Quite the opposite. Wince interpreted that comment as discriminatory. *Id.* at ¶ 68.

---

[8] Wince disputes this fact "because Pierz is the individual who told [him] to look for project management roles elsewhere." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 141). He cites his deposition, which does support both that Pierz "indicated that [he] would not advance at CBRE" and "suggested that [he] get a certificate in project management." *See* Wince Dep., at 315:15-19 (Dckt. No. 121-1, at 107 of 181). But that passage doesn't contradict Defendants' asserted fact. If anything, it confirms it, and simply adds further details.

That comment came in the context of a broader conversation about Wince's future with CBRE, including the likelihood of a leadership position. Pierz basically was telling Wince that a leadership role wasn't in the cards for him at CBRE. So, Pierz told Wince that if he wanted a leadership position, he needed to look elsewhere. *Id.*

Wince doesn't know if Pierz had that conversation with anyone else. *Id.* Regardless, he decided to take a project management course on Pierz's advice. *Id.*

In June 2018, Wince completed one class at the University of Chicago. *Id.* at ¶ 43. Pierz requested approval for unscheduled paid time off for Wince to take the course, writing that he was "a big supporter in folks seeking further training/education and would like to try to accommodate [Wince's] request." *Id.* at ¶ 45.

CBRE approved the cost of the course in the amount of $1,250. *Id.* And Northwestern Memorial Hospital, through an agreement with CBRE, reimbursed the cost, too. *Id.* The record does not reveal whether Wince had to pay anything out-of-pocket for the course. It appears from the record that CBRE paid the entire cost of the course. *Id.* ("CBRE approved the cost of the course (which was reimbursed by NMH pursuant to a CBRE agreement with NMH) in the amount of $1,250 . . . .").

Wince never finished the entire course, though. (The parties are not clear, but it seems as though the *course* included a number of different *classes.*) *See* Wince Dep., at 274:9-12 (Dckt. No. 121-1, at 96 of 181). He didn't take any more classes after the first one. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 141). He was "counting on . . . having overtime to pay for the course," but he "was stripped of having overtime, so [he] was unable to continue . . . paying for the course." *See* Wince Dep., at 22:11-15; *see also* Pl.'s Resp. to Defs.' Statement of

Facts, at ¶ 44. The parties don't explain what it means that Wince was "stripped of having overtime."

The parties then pivot to a discussion of the availability of overtime, without much of an explanation. The link between the availability of overtime and the availability of courses is not entirely clear. The parties agree on statements such as the following: "Wince did not take any more courses because he needed overtime to pay for the course." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 141). Maybe the company didn't reimburse employees in full, and Wince couldn't afford the courses without additional overtime.

Putting that mystery aside, Defendants presented evidence that Wince had plenty of opportunity for additional overtime. Defendants point to a spreadsheet showing that they offered Wince 830.5 hours of overtime in 2018. *See* Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 137); Wince Dep., at 210:11-18 (Dckt. No. 121-1, at 80 of 181). The same document showed that he only accepted 56 hours. *See* Defs.' Statement of Facts, at ¶ 44; *see also* Overtime List by Seniority 2018 (Dckt. No. 121-3, at 3 of 307); Ward Dec., at ¶ 3 (Dckt. No. 121-6, at 93 of 96) (laying the foundation for the spreadsheet).

But at deposition, Wince testified that the document must be wrong. He stated that he did "not know how they came up with these numbers," and that he believed he "may" have accepted and been offered "less" overtime. *See* Wince Dep., at 211:23 – 212:8 (Dckt. No. 121-1). He testified: "I don't believe that that's correct either." *Id.* at 211:9-10.

Next, Wince argues that the CBA had a list of employees eligible for tuition reimbursement, and his name was not on the list. *See* Pl.'s Statement of Facts, at ¶ 24 (Dckt. No. 135); *see also* Wince Dep., at 339:11-17 (Dckt. No. 121-1, at 113 of 181). But the list Wince cites was from the *2010* CBA. *See* 2010 Collective Bargaining Agreement (Dckt.

No. 121-2, at 151 of 216). It names "employees that are currently receiving tuition reimbursement from NMH." *Id.*

A list made eight years before Wince was even eligible for a tuition reimbursement tells the Court nothing. And Wince provides no other evidence supporting his denied overtime or reimbursement.

## VIII. Discriminatory Comments

Wince also presented evidence about discriminatory comments at work.

In 2016 or 2017, several cruel and highly inappropriate statements were written on Wince's lunchbox. He testified that unknown people wrote the n-word, as well as "you don't belong here" and "we don't want you here." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 77 (Dckt. No. 141).

Wince doesn't know who wrote those offensive comment. And importantly, he never told anyone at CBRE what had happened. *Id.* Instead, he blotted out the slur and statements. *Id.*

Additionally, Wince took issue with his nickname around the hospital. Coworkers and management called him "Sly." *Id.* at ¶ 78. Wince testified that "people just felt abbreviate[ing] my name was easier to remember me by, but [he] didn't like it." *See* Wince Dep., at 12:8-9 (Dckt. No. 121-1, at 5 of 181). He believed it was racially derogatory because "[w]hen you think of someone as Sly, you think of someone sneaky or . . . someone that's trying to do something . . . not honest." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 79 (Dckt. No. 141).

But he never told anyone at CBRE that he felt that way. There is no evidence in the record that he asked anyone to stop using the nickname, or that he complained to management.

19

IX.     **This Lawsuit, Final Issues, and Wince's Departure**

Eventually, Wince began to see a therapist to manage anxiety and depression caused by work-related stress. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶ 17 (Dckt. No. 137). And by November 2018, Wince had enough. He filed a Charge of Discrimination with the EEOC, alleging racial discrimination and retaliation. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 4 (Dckt. No. 141). Later that month, the EEOC dismissed the claim and issued Wince a Notice of Right to Sue. *Id.* So, in March 2019, Wince sued. *See* Cplt. (Dckt. No. 1).

But even after he filed the lawsuit, Wince still felt discriminated against. The day after he filed, Wince received a verbal warning (which came without any loss of pay). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 13 (Dckt. No. 141). The warning came from Chief Engineer Jose Hernandez and Assistant Operations Manager Alejandro Corona for failing to respond to a work order about a water leak in a kitchen. *Id.*

Wince disagreed with the warning. *Id.* He thought that Hernandez and Corona wanted to sully his work record because he was a "minority." *Id.* And he thought that Hernandez was trying to make his record look bad, while being friendly with the white engineers. *Id.* at ¶ 73.

This verbal warning was not the first run-in with Hernandez. Wince also believes that in 2018 or 2019, Hernandez was involved (in some vague way) in giving him unfair work assignments at the trainee level because he is black. *Id.* at ¶ 74. Meanwhile, a trainee received all of Wince's assignments. *Id.*

Specifically, Hernandez assigned Wince to clean drains. *See* Pl.'s Statement of Facts, at ¶ 18 (Dckt. No. 135). But Wince's job description states that Stationary Engineers are responsible for maintenance on "all aspects of plumbing" and that they "[m]ay perform less technical duties as required, such as minor plumbing." *See* Defs.' Resp. to Pl.'s Statement of

20

Facts, at ¶ 18 (Dckt. No. 137); *see also* Stationary Operating Engineer Job Description (Dckt. No. 121-1, at 176–77 of 181).

Wince never suffered a loss of pay, and he could not estimate how many times these unfair assignments happened. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 74 (Dckt. No. 141). He simply noted that he believed Hernandez was involved, and that he had more seniority so it should not have happened. *Id.*

By October 2019, Wince had enough of CBRE. He left his job to take a position at TL Services at the Hines VA Hospital. *Id.* at ¶ 80.

The parties disagree on how to define his departure. Defendants say that Wince "quit," and note that he "received a higher level of what [he] was doing, meaning that he was in a high role position" at the new job. *Id.* But Wince says that "he did not quit." *Id.* He argues that he "was constructively terminated," instead. *Id.* "Although he was in a supervisory position, he was making less money and had benefits that were not as good as CBRE, especially his healthcare." *Id.*

After Wince switched jobs, he also amended his complaint. *See* Second Am. Cplt. (Dckt. No. 52); Third Am. Cplt. (Dckt. No. 96). In November 2020, Wince filed the operative complaint. *See* Third Am. Cplt.

The third amended complaint includes four counts: (1) Title VII race discrimination against CBRE; (2) race discrimination and retaliation under 42 U.S.C. § 1981 against CBRE, Hernandez, Ravelo, Pierz, Saulig, Holland, and Nash; (3) Title VII retaliation against CBRE; and (4) constructive discharge by CBRE through its agents Hernandez, Ravelo, Pierz, Saulig, Holland, and Nash. *Id.* at ¶¶ 76–120.

21

After discovery, Defendants moved for summary judgment on all four counts. *See* Defs.'
Mtn. for Summ. J. (Dckt. No. 120).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no
genuine dispute as to any material fact and the movant is entitled to judgment as a matter of
law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is
such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of
establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*,
477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond
the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See
Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving
him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th
Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of
the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l
Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary
judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in
favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*,
674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Defendants moved for summary judgment on all four counts. The first three counts are
federal statutory claims. Count I is a race discrimination claim under Title VII. Count II is a

22

race discrimination and retaliation claim under section 1981. And Count III is a retaliation claim under Title VII. Courts apply the same *prima facie* requirements for claims under Title VII and section 1981. *See Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007) (collecting cases). So, the Court will not differentiate between the two statutes. Instead, it will assess the race discrimination claims first, and then will turn to retaliation.

Count IV alleges constructive discharge under state law. But Illinois law does not recognize an independent cause of action for constructive discharge. *See Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 708 (7th Cir. 2004) ("[T]he [Illinois Supreme Court] 'has thus far declined to recognize a cause of action for retaliatory constructive discharge.'") (quoting *Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455, 243 Ill. Dec. 46, 722 N.E.2d 1115, 1121 (1999)). So, Defendants' motion for summary judgment is granted for Count IV, to the extent that Wince is bringing constructive discharge as an independent cause of action.

The Court will consider the facts alleging constructive discharge in its analysis of the race discrimination and retaliation claims. One of the necessary conditions of a successful discrimination claim is an adverse employment action. And Wince argues that he faced an adverse employment action through constructive discharge. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 10 (Dckt. No. 133) ("A reasonable factfinder could conclude that Plaintiff's race . . . was the cause of Defendant CBRE's constructive termination of Plaintiff from its employment.").

As a preview, Wince has not carried his burden. Wince did not provide enough evidence to support a claim of race discrimination or retaliation. As a result, Defendants' motion for summary judgment is granted on Counts I, II, and III.

## I.        Race Discrimination

The first question is whether Wince provided enough evidence to support a verdict by a reasonable jury that CBRE discriminated against him on the basis of his race.

In ruling on a race discrimination claim at summary judgment, the Court considers "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Igasaki v. Illinois Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 957 (7th Cir. 2021).

Traditionally, a plaintiff has two routes to prove discrimination.  One option is the direct method.  "A plaintiff proceeds under the direct method of proof by showing 'either direct or circumstantial evidence of intentional racial discrimination.'"  *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

Another route to prove discrimination is the indirect method, meaning the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that approach, "the plaintiff has the initial burden of producing evidence showing that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably."  *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016)  If the plaintiff establishes those elements, "the burden shift[s] to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual."  *Id.* (cleaned up).

In recent years, the Seventh Circuit has pivoted away from a strict divide between the direct method and the indirect method, and has moved toward a more holistic approach. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Ortiz*, 834 F.3d at 765.

Wince begins his brief by discussing the *McDonnell Douglas* framework, and then acknowledges the existence of *Ortiz*. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 8–9 of 31 (Dckt. No. 133). In the pages that follow, Wince appears to discuss the evidence as a whole, seemingly in the spirit of *Ortiz*. But he never clarifies if he is applying *McDonnell Douglas*, or simply throwing all the evidence at the Court and declaring that it adds up to race discrimination.

For instance, when discussing his failed promotion, Wince notes that he "has established a prima facie case of discrimination," and walks through the *McDonnell Douglas* test. *Id.* at 13–14 of 31. Additionally, he includes an entire section discussing why Defendants' legitimate, nondiscriminatory reasons are pretextual, so it sounds like he is using the indirect method. *Id.* at 23–25 of 31. In other places, Wince makes arguments about the totality of the evidence and *Ortiz*. *See, e.g.*, *id.* at 16 of 31 (discussing *Ortiz* in the context of his denial of holidays); *id.* at 25 of 31 (discussing *Ortiz* to establish a pattern and practice of discrimination).

So, this Court will approach the issue as follows. First, this Court will consider each category of alleged discrimination (*e.g.*, the lack of promotions, holiday time off, and so on), and will consider whether the evidence is sufficient to give rise to a claim using the indirect method. Then, this Court will take a step back, view the record as a whole, and consider if there is enough evidence to support a finding of race discrimination by a reasonable jury.

In his brief, Wince argued that he suffered race discrimination in the following areas: (1) promotions; (2) overtime; (3) holidays; (4) paid time off; (5) bonuses; (6) tuition reimbursement; (7) verbal reprimand; (8) work assignments; and (9) constructive discharge. This Court will address each topic, in that order.

### A.  Promotions

To start, Wince claims that the company discriminated against him because he applied for four promotions, but did not get any of them. *Id.* at 11–14 of 31.

A failure to promote can be an adverse employment action for a discrimination claim. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 892 (7th Cir. 2016). To make a *prima facie* case, Wince would need to show that "(1) [he] was a member of a protected class; (2) [he] was qualified for the position sought; (3) [he] was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position." *Id.*

Only the last element is at issue here. The question is whether Wince came forward with sufficient evidence that the company promoted someone who was not better qualified.

Wince did not receive two promotions to Assistant Chief Engineer and two promotions to Chief Engineer. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 34, 36, 38, 41 (Dckt. No. 141). But Wince fails to confront the evidence about the normal progression to these positions. Promotions typically happen in the following order: (1) Stationary Engineer; (2) Lead Engineer; (3) Assistant Chief Engineer; and finally (4) Chief Engineer. *Id.* at ¶ 34. So, Wince wanted to skip a few spots in line.

The people who did get the promotions didn't jump the line. Brudniak was an Assistant Chief Engineer (at Prentice Women's Hospital) before Holland hired him (twice) as an Assistant

Chief Engineer.  *Id.* at ¶¶ 39–41.  Hernandez was an Assistant Chief Engineer before becoming a Chief Engineer in 2015.  *Id.* at ¶ 35.  So they were two steps above Wince in the corporate ladder.

Unlike Brudniak and Hernandez, Walsh was hired from outside the company.  But Walsh had over 14 years of experience as a Chief Engineer at other companies when he got the job at CBRE in 2016.  *Id.* at ¶ 37.

Wince failed to present evidence that the promotions went to less qualified people.  If anything, the record confirms that CBRE hired people with better qualifications than Wince.  They had experience in higher-level positions.  And in comparison, Wince had only "basic qualifications and certifications to perform the work that any general Stationary Engineer could be assigned."  *See* Holland Dec., at ¶ 13 (Dckt. No. 121-6, at 37 of 96).

Wince also presented evidence that Saulig didn't like him.  Recall, Saulig "blurted out that we don't like you" at some point at some meeting.  *See* Wince Dep., at 289:24 – 290:12 (Dckt. No. 121-1, at 100 of 181).  But there is no evidence that Saulig didn't like him because of his race.  And the incident in question is not tied to any particular time in the chronology.  So, Saulig didn't like Wince, and said so at one point.  But that's about it.

In sum, Wince has not come forward with sufficient evidence to support a jury verdict in his favor that he was passed over for promotions because of his race.

### B. Overtime

Wince argues that CBRE denied him overtime on 18 occasions in 2018.  *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 14 of 31 (Dckt. No. 133); *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 62 (Dckt. No. 141).

To make a *prima facie* case, Wince would need to provide evidence that he (1) is a member of a protected class, (2) was meeting the defendant's legitimate expectations, (3) suffered an adverse employment action, and (4) was not treated as favorably as similarly situated employees outside of his protected class. *See Simpson*, 827 F.3d at 661. For his overtime claim, Wince failed to provide evidence about any similarly situated individuals.

Of the 18 occasions that Wince did not receive overtime, CBRE gave other employees overtime 13 times. *Id.* at ¶ 62. So, on 5 of 18 days, no one received overtime. Everyone received the same thing: nothing.

Hypothetically speaking, it is conceivable that someone could bring a discrimination claim about overtime, even though *no one* received overtime. Imagine if only one employee was eligible, because only one employee worked extra hours. And imagine if a racist boss refused to pay overtime to that employee, even though he or she earned it, because of his or her race. In that scenario, the fact that no one received overtime would not preclude a claim.

But there is no such evidence in the record here. No one received overtime on 5 of the 18 days. That fact does not get Wince very far, because there is no evidence in the record that his denial of overtime had anything to do with his race.

After putting aside those 5 times, that leaves 13 days out of 18 when some other employee received overtime, but Wince did not. On 5 of the 13 times, another black employee received overtime. They are not outside his protected class. *See Arizonovska v. Wal-Mart Stores, Inc.*, 682 F.3d 698, 702–03 (7th Cir. 2012) ("The 'similarly-situated' inquiry is a 'flexible, common-sense one,' but it at least requires that the plaintiff name a comparator outside her protected class.") (citation omitted).

28

That leaves 8 of the 18 times. In those instances, a non-black employee received overtime, but Wince did not. Still, the record about those episodes is barren. There is nothing in the record showing that they were similarly situated as Wince. For example, Wince did not come forward with evidence that he performed the same work as those other employees.

Wince presented evidence that those employees received overtime, and he did not. That's a piece of the puzzle, but it's not enough to put together a picture of discrimination. Wince would need to come forward with evidence that they were similarly situated, that is, that Wince did the same thing as the other employees (*e.g.*, working the same number of hours, or doing the same task, and so on), but received different pay.

And here, there's no such evidence. Without evidence that the other employees are similarly situated, there is not a sufficient basis for a finding of discrimination. *See Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) ("In general, a plaintiff who believes another individual is similarly situated must at least show that this comparator (1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish his conduct or the employer's treatment of him.") (cleaned up).

Wince has no evidence that similarly situated individuals outside his protected class received better treatment involving overtime. Without that evidence, he can't make a *prima facie* claim about overtime.[9]

---

[9] Even if those eight individuals were similarly situated, Wince provided no evidence – or even argument – for race discrimination. The parties mostly bicker about whether the CBAs authorized overtime to employees specifically in the Controls group, even though the Controls group is not a separate entity in the CBAs. *See* Defs.' Mem. in Support of Mtn. to Dismiss, at 4 (Dckt. No. 122); Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 14 of 31 (Dckt. No. 133). Wince's statement of facts make clear that his argument hinges on the CBA: "The CBA did not have 'controls' listed as its own entity. Plaintiff worked for controls, since controls is part of his role as a Stationary Engineer. He was passed over for controls overtime despite his seniority in that group many times." *See* Pl.'s Statement of Facts, at ¶ 10

### C.     Holidays

Wince argues that CBRE denied his request for holiday leave from 2016 through 2019. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 14–17 of 31 (Dckt. No. 133). Once again, Wince has not come forward with enough evidence to support a discrimination claim.

Wince provided evidence that he did not receive several holidays off between 2016 and 2019. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 46–47, 57, 59 (Dckt. No. 141); Pl.'s Statement of Facts, at ¶ 6 (Dckt. No. 135). But he did not present evidence of race discrimination.

In 2016, Wince checked "No" for every holiday except New Year's Day, which he received off. *Id.* at ¶ 46. So, that year, he has no evidence of an adverse action. He didn't ask, so he didn't get.

In 2017, Wince received no holidays off, and he provided evidence that a non-black, less senior employee (Ciaran Officer) received several holidays off that year. *Id.* at ¶¶ 48, 52. Even if Officer qualifies as a comparator, Defendants offered a legitimate, nondiscriminatory reason for the decision.

When filling out his form, Wince checked "Yes" for every holiday, but he listed alternate days next to each holiday, too. *Id.* at ¶ 47. Wince says that he "put down alternate days because he knew it was unlikely he would be approved for the holidays off, but wanted time at least near the holiday." *Id.* And, sure enough, Defendants approved Wince for time off on these alternate days, rather than the holidays. *Id.* at ¶ 48.

---

(Dckt. No. 135). That argument has nothing to do with race. Wince says that Defendants violated the CBA. But violating the CBA is not a Title VII claim. It's a contract claim. All Wince provides is a potential violation of a contract, with nothing more. From that, a reasonable jury could not find race discrimination.

Wince asked to take off either the holidays or the alternate days that he selected, and the company gave him time off on those alternate days. And even then, after Wince raised the issue, Defendants worked to get him at least one holiday off. *Id.* at ¶¶ 52–54.

Wince argues that CBRE's explanation is pretextual. According to him, "[a] better explanation, especially since Wince has not been allowed holiday time off in 17 years, is that the denial of holiday time off as related to this Plaintiff was deliberate and intentional." *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 16 of 31 (Dckt. No. 133).

Pretext "is not 'just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action.'" *Barnes v. Bd. of Trs. of Univ. of Illinois*, 946 F.3d 384, 389–90 (7th Cir. 2020) (cleaned up) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008)). To show pretext, a plaintiff must come forward with evidence that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quotation marks and citation omitted).

Wince offers no evidence of pretext. He boldly claims that he was denied holiday time for 17 years. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 16 of 31 (Dckt. No. 133). That's a strong assertion, but Wince doesn't back it up. Wince does not present evidence that he requested holiday leave for 17 years, but didn't get it.

Wince offered nothing to show that Defendants' reason was a lie. In fact, Defendants' reason seems quite legitimate. On the request form, Wince wrote down alternate dates, and Defendants gave him those dates off. Without any evidence that this explanation "was dishonest," Wince has no claim about holiday time in 2017.

Finally, in 2018 and 2019, Wince requested all or several holidays off. *Id.* at ¶¶ 57, 59. He only received 2019 New Year's Day off. *Id.* at ¶ 59. Regardless, he provided no evidence of similarly situated non-black employees who received holidays off. And, in fact, Defendants provided evidence that several, more senior black employees received those holidays off instead of Wince. *Id.* at ¶¶ 58, 60. Without evidence of a non-black, less senior employee who received favorable treatment for holidays, Wince has failed to come forward with enough evidence to support a claim of race discrimination.

In sum, Wince has not presented evidence that could support a verdict by a reasonable jury that the company denied him time off for holidays based on his race.

### D.    Paid Time Off

Wince's next argument is that the miscalculation of his 2019 paid time off was an adverse employment action. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 17–18 of 31 (Dckt. No. 133). But Wince provided no evidence that Defendants denied him paid time off in 2019. And he also provided no evidence of similarly situated individuals for comparison.

In his response brief, Wince argues that "the CBA provided that once he reached his 15th year of employment, he would be entitled to 240 hours of PTO plus he would accrue an additional 9.3 hours per pay period. Wince was able to calculate the time, but CBRE through the HR representative Nash refused to grant him the time earned." *Id.* at 17 of 31. But Wince provided no evidence that Nash refused to grant him the time off that he earned. The citation in his brief is to an unrelated statement of fact. *See* Pl.'s Statement of Facts, at ¶ 16 (Dckt. No. 136). And no other statement of fact provides evidence of refused paid time off.

Even if Wince had evidence that Nash denied him paid time off, he still would not have enough to get to a jury. Wince agreed that he only thought "it was 'possible' that [the denial]

was based on his race." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 67 (Dckt. No. 141).

And he "does not know if anyone else had similar issues one way or the other." *Id.* So, there is

nothing in the record about a comparator to support a finding that race played a role.

Without evidence of denied paid time off, Wince faced no adverse employment action.

And without a comparator, Wince could not make a *prima facie* case for race discrimination,

even if he had evidence about denied paid time off. As a result, no reasonable jury could find

race discrimination on this issue.

### E. Bonuses

Wince argues that CBRE and Pierz reduced his bonus in 2018 and 2019 because of his

race. *Id.* at 18 of 31; *see also* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 64–65; Pl.'s

Statement of Facts, at ¶ 20 (Dckt. No. 135); Wince Dep., at 316:10-24 (Dckt. No. 121-1, at 107

of 181). But once again, the evidence simply isn't there.

In 2018, CBRE gave all employees in Work Group 1 (Wince's work group) an annual

bonus of $879.38. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 64 (Dckt. No. 141).

Members of Work Groups 2 and 3 received bonuses of $1,096.37 and $1,058.08, respectively.

*Id.* Then, in 2019, CBRE gave the members of every group the same bonus: $824.05. *Id.* at

¶ 65.

Wince attempts to poke holes in Defendants' evidence. He complains that "[r]ather than

produce hard evidence (i.e., paystubs) in the record that everyone received reduced bonuses,

Defendants rely on the Deposition of Plaintiff (who would not be aware of his colleague's

bonuses) and a Declaration of Nash, who never assisted Plaintiff with the PTO issues that

Plaintiff wishes to resolve, to attempt to make this point." *See* Pl.'s Resp. in Opposition to Mtn.

for Summ. J., at 18 of 31 (Dckt. No. 133).

But Defendants based their statement of facts on the declaration of Maya Nash, a human resources officer for CBRE with personal knowledge of the company's bonus structure. *See* Nash Dec., at ¶¶ 1–2, 6–8 (Dckt. No. 121-5, at 53 of 96). That declaration is a sufficient evidentiary foundation. And on the flipside, Wince offered no evidence of his own. There is no evidence that he received a lesser bonus than similarly situated employees.

So, according to the evidence, at no time did CBRE single out Wince. "The only facts regarding similarly situated coworkers indicate that they were treated the same as [Wince]." *See Hudson v. Miramed Revenue Grp.*, 2016 WL 6948374, at *5 (N.D. Ill. 2016) (Feinerman, J.).

Treating everyone the same is not discrimination. Equal treatment across the board is not a basis for a claim. If anything, it suggests an even-handed approach by CBRE. Everyone was in the same boat, in the same bonus pool.

No reasonable jury could find that the change in Wince's bonus was race discrimination.

## F.    Tuition Reimbursement

Wince argues that CBRE refused to reimburse him for a project management course, and that he did not have the overtime to pay for the course. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 18–19 of 31 (Dckt. No. 133); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 44). But Wince fails to make a *prima facie* case of employment discrimination here, too.

Again, when discussing tuition reimbursement, the parties largely discuss opportunities for overtime. The parties do not explain the link between the two. As best as the Court can surmise, Wince apparently needed a certain amount of overtime in order to take the course.

The reason is unclear. Maybe he needed to pay for part of the course himself, but couldn't afford to do so unless he earned extra money through overtime. Or, maybe Wince wasn't eligible to participate in the company's reimbursement program unless he stepped up to

the plate and worked extra hours. The reason for linking the tuition reimbursement and the overtime is not clear, but the Court will put that open question to the side.

Wince has claim on this issue. Wince does not provide evidence that Defendants actually denied him overtime, and he offers no evidence of a similarly situated individual who received more opportunities for overtime, either.

Defendants provided evidence that they offered Wince over 800 hours of overtime in 2016, and that he accepted only 56 hours. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 44 (Dckt. No. 141); Ward Dec., at ¶ 3 (Dckt. No. 121-6, at 93 of 96). Wince seems to argue that the evidence could be fraudulent or fabricated, but he doesn't come forward with a non-conclusory reason to reach that conclusion.

Testimony by Wince that the spreadsheet overstates the amount of overtime that the company offered him probably creates an issue of fact on that limited point. The company offered evidence that it offered Wince hundreds of hours of overtime, and Wince testified that that figure was inflated. That testimony was conclusory, but it likely is enough to raise an issue of fact. (By way of comparison, imagine if someone showed you a spreadsheet of the number of times that you have been to Slovakia. A flat denial would probably suffice to create a disputed issue.)

But a dispute about the amount of overtime opportunities is not enough to get to a jury. To bring a discrimination claim, Wince would need to come forward with evidence that the company denied him overtime opportunities based on his race. For example, Wince would need to offer evidence that similarly situated non-black employees received more opportunities for overtime than Wince. But the evidence simply is not there.

Wince also argues that CBRE's list of reimbursement-eligible officials omits his name. *See* Pl.'s Statement of Facts, at ¶ 24 (Dckt. No. 135). But that list is from *2010* – eight years before Wince looked into any management courses. *See* 2010 Collective Bargaining Agreement (Dckt. No. 121-2, at 151 of 216); *see also* Defs.' Statement of Facts, at ¶ 24 (Dckt. No. 137).

The record about tuition reimbursement and overtime opportunities cannot support a claim about race discrimination.

### G.    Verbal Reprimand

Wince argues that Hernandez gave him a verbal warning so that he would look bad. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 12, 73 (Dckt. No. 141). Wince believes that he received a reprimand because he is black. *Id.* But Wince admits that the verbal reprimand came with no loss of pay, and he offers no other tangible repercussions. *Id.* at ¶ 73.

"Unfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice" as adverse employment actions. *See Boss v. Castro*, 816 F.3d 910, 919 (7th Cir. 2016). So, no reasonable jury could find race discrimination based on a verbal reprimand, standing alone.

### H.    Work Assignments

Wince argues that "the embarrassing, degrading, and demeaning drain-cleaning that was assigned to Plaintiff post complaints" is an instance of race discrimination. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 20 of 31 (Dckt. No. 133); *see also* Pl.'s Statement of Facts, at ¶ 18 (Dckt. No. 135). But Wince's subjective opinions about these assignments are not enough to reach a jury. "[S]ubjective impressions about the desirability of particular work assignments, without more, are insufficient" for race discrimination. *See Ziccarelli v. Dart*, 581 F. App'x 563, 567 (7th Cir. 2014).

And even then, the jobs that Hernandez assigned to Wince fell within the job description of a Stationary Engineer. *See* Stationary Operating Engineer Job Description (Dckt. No. 121-1, at 176–77 of 181). There is no contrary evidence.

Requiring an employee to do his or her job isn't an adverse action. There is no evidence that Hernandez directed Wince to perform certain jobs, but did not make similar assignments to other similarly situated, non-black Stationary Engineers.

No reasonable jury could find that Defendants discriminated against Wince based on his race when the company directed him to clean the drains.

## I. Constructive Discharge

Wince also asserts constructive discharge, and basically makes an *Ortiz* argument. That is, Wince argues that, even if each individual action were not enough to find employment discrimination, the totality of the actions led to his constructive discharge. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 21–23 of 31 (Dckt. No. 133). This constructive discharge, then, is the adverse employment action. But Wince faces a fatal flaw in this argument: he has not provided evidence of a constructive discharge.

"A constructive discharge constitutes an adverse employment action." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). It comes in two different forms.

"In the first form, an employee resigns due to alleged discriminatory harassment." *Id.* When pursuing a constructive discharge claim about working conditions, a plaintiff must show conduct that is "even more egregious than the high standard for hostile work environment." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (cleaned up). And "a hostile work environment claim requires sufficient evidence demonstrating (1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on

membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss*, 816 F.3d at 920.

In the second form, "an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns." *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002).

For either form, "the plaintiff [must] show[] that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin*, 621 F.3d at 679.

Wince offers arguments under both forms of constructive discharge. For the first form, Wince rehashes the above arguments. He contends that "the repeated failure to promote, denial of holiday time off for 17 years, denial of overtime opportunities, failure to award PTO as per the CBA, and the disregard for Plaintiff's complaints" all provide evidence of harassment. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 21 of 31 (Dckt. No. 133). But, as already explained, none of those episodes amounted to race discrimination. So, none of them could satisfy the standard for a hostile work environment claim, let alone the even higher standard for a constructive discharge claim.[10]

For the second form, Wince argues that Defendants made clear that he had no future at the company. He argues that "Pierz specifically told [him] to look outside of the company for project management roles. If that is not a clear sign that Wince had no future CBRE, it is unclear what would be." *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 21 of 31 (Dckt. No. 133). He offers no other evidence beyond that statement.

---

[10] Wince also makes an argument that he feared for his personal safety. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 21 of 31 (Dckt. No. 133). But he cited no evidence that he *did* fear for his safety, so this argument fails.

But Pierz's statement is not evidence of imminent *termination*. *See Univ. of Chicago Hosps.*, 276 F.3d at 332. His statement is evidence that Wince might need to look elsewhere for a *promotion*.

Wince also agreed that, after Pierz made this statement, he encouraged him to take the project management course at University of Chicago. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 68 (Dckt. No. 141). He took that course in 2018. *Id.* at ¶ 43. And he maintained his job – with no evidence of imminent termination at all – until he left in October 2019. *Id.* at ¶ 80.

So, Wince did not provide evidence that CBRE planned to fire him. And without evidence of an upcoming termination, there is no evidence of a constructive discharge under the second pathway.

## J.    Viewing All the Evidence Together

Wince has failed to present evidence that would allow a reasonable jury to find that Defendants discriminated against him based on his race in any of the eight subcategories that he has proposed. And he's failed to present evidence that all those individual concerns, taken together, caused his constructive discharge.

Under *Ortiz*, this Court must pile all the evidence into one basket and consider it together. *Ortiz*, 834 F.3d at 765. But even when considering all Wince's evidence at once, the Court can't see a triable fact.

The evidence of discrimination is insubstantial. Wince attributes many work-related issues to discrimination. But after a close look at the record, the evidence simply isn't there.

The evidence shows that he lost out on promotions to more qualified people. He received holiday time off when it was available (often getting what he requested). He earned the same bonuses as his coworkers. He received a tuition reimbursement, too.

There is no evidence that the company treated him unfavorably compared to his coworkers when it came to paying overtime, or offering opportunities for overtime, or paying him non-holiday leave.

His boss scolded him once for not doing his job, and Wince got upset when his boss asked him to do jobs that he didn't like. Those workplace frustrations happen from time to time. But Wince offers no evidence linking that treatment to his race.

Wince did testify about racist and abusive comments on his lunchbox. But there is no evidence that the company tolerated any such behavior. In fact, the evidence is that someone scribbled that offensive language, and Wince never told anyone about it.

Finally, to the extent that Wince brings a separate "pattern and practice claim" under section 1981, there is not enough evidence to support that claim, either. *See* Third Am. Cplt., at ¶ 99 (Dckt. No. 96); Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 25–27 of 31 (Dckt. No. 133). "To demonstrate a pattern or practice of discrimination, a plaintiff must show by a preponderance of the evidence that race or gender discrimination was the company's 'standard operating procedure – the regular rather than the unusual practice.'" *Benjamin v. Katten Muchin & Zavis*, 10 F. App'x 346, 352 (7th Cir. 2001) (citation omitted). As discussed, Wince did not provide any evidence of race discrimination, let alone evidence that race discrimination was "standard operating procedure" for CBRE.

As a result, Defendants' motion for summary judgment on the race discrimination claim under Title VII (Count I) and under section 1981 (Count II) is granted.

## II. Retaliation

Wince also brings retaliation claims under section 1981 (Count II) and under Title VII (Count III). He points to the fact that he testified in support of his coworker's race

discrimination suit. He also points out that he complained about mistreatment (*e.g.*, by filing grievances), and filed an EEOC complaint. *See* Pl.'s Resp. in Opposition to Mtn. for Summ. J., at 6–7 of 31 (Dckt. No. 133).

Like discrimination, a plaintiff can prove retaliation through the direct or indirect method. The direct method requires a plaintiff to show that "(1) he engaged in protected activity, (2) he suffered a materially adverse employment action, and (3) there was a causal link between his protected activity and the adverse action." *Harden v. Marion Cnty. Sheriff's Dep't*, 799 F.3d 857, 862 (7th Cir. 2015).

Under the indirect method, a plaintiff must show that "(1) he engaged in protected activity, (2) he suffered a materially adverse employment action, (3) he was meeting his employer's legitimate expectations, and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *Id.* At that point, "the burden shifts to the employer to articulate some legitimate, nonretaliatory reason for its action. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a pretext, which in turn permits an inference of unlawful discrimination." *Id.* (cleaned up).

There is no evidence in the record about retaliation. In fact, in his response brief, Wince does not devote much attention to the issue. He only makes fleeting remarks about retaliation throughout, seemingly focusing on race discrimination instead.

Wince does not come forward with evidence that the company took action against him because he testified when his coworker complained about discrimination. And there is no evidence that the company disciplined him, reprimanded him, or treated him adversely in any other way because he filed the EEOC complaint or otherwise complained about treatment at work. *See Mollet v. City of Greenfield*, 926 F.3d 894, 896 (7th Cir. 2019) ("Title VII prohibits

41

employers from retaliating against employees for complaining about discrimination."); *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) ("The question is whether plaintiffs have offered sufficient evidence to create a genuine issue of material fact on whether their complaint caused their terminations.").

Wince seems to argue that each episode discussed above (that is, failure to promote, denied overtime, etc.) is an adverse action taken in response to his protected activities of complaining about race, speaking to outside counsel about his coworker, and filing an EEOC complaint. *See* Defs.' Resp. to Pl.'s Statement of Facts, at ¶¶ 1–2 (Dckt. No. 137); Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 4, 19 (Dckt. No. 141).

Wince's complaints to CBRE about racism in promotions and his complaints to outside counsel came several years before he left the company. That length of time "weaken[s] but does not conclusively bar an inference of retaliation." *See Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014). But "if the time interval standing alone is long enough to weaken an inference of retaliation, the plaintiff is entitled to rely on other circumstantial evidence to support her claim." *Id.*; *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) ("This court has held a temporal connection of four months failed to establish a causal connection between a protected activity and an adverse action.") (collecting cases). Here, there is no such circumstantial evidence of any significance.

Wince also suffered no adverse action after his EEOC complaint. He points to the verbal reprimand, but that's about it. And that's not enough.

Defendants' motion for summary judgment on the retaliation claims under section 1981 (Count II) and Title VII (Count III) is granted.

42

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted.


Date:   March 10, 2022

_____

Steven C. Seeger
United States District Judge